Donald Wayne STROUTH, Appellant,

v.

STATE of Tennessee, Appellee.

Court of Criminal Appeals of Tennessee, at Knoxville.

Oct. 28, 1986.

Permission to Appeal Denied by Supreme Court June 22, 1987.

Mark Evan Olive, Tallahassee, Fla., for appellant.

Gordon W. Smith, Asst. Atty. Gen., Nashville, Carl K. Kilpatrick, Dist. Atty. Gen., H. Greeley Wells, Asst. Dist. Atty. Gen., Blountville, for appellee.

## OPINION

DAUGHTREY, Judge.

Donald Wayne Strouth, currently an inmate on death row at the state penitentiary, was convicted of first degree murder and sentenced to death in 1978 for the murder of a Kingsport shopowner, Jimmy Keegan. Strouth's conviction and death sentence were affirmed by the Tennessee Supreme Court in 1981. *State v. Strouth,* 620 S.W.2d 467 (Tenn.1981).

The following year, Strouth filed a petition for post-conviction relief, which was denied by the trial court. He now appeals that ruling on multiple grounds. He contends (1) that he was not given a full and fair hearing on his post-conviction petition; (2) that he received ineffective assistance of counsel at trial and (3) at his sentencing hearing; (4) that his conviction was caused by the state's failure to reveal exculpatory evidence; (5) that the jury was improperly charged; (6) that the sentencing hearing was marked by reversible error; and (7) that other miscellaneous claims require reversal despite the state's insistence that they are foreclosed from review as previously determined or waived. The brief filed in this court in support of Strouth's appeal reflects a high degree of thoroughness and dedication on the part of petitioner's current attorney. But despite the valiant effort of counsel to secure his client a new trial or penalty hearing or both, we find no basis upon which to disturb the trial court's judgment, and we therefore affirm the denial of relief.

### 1. The Post–Conviction Hearing

Strouth first claims that he was denied a full and fair hearing on his post-conviction petition and that the trial court's order denying relief provides an insufficient basis for appellate review. He challenges specifically the denial of funding for certain experts, the form of the order denying relief, and the alleged bias of the trial judge who ruled on his petition.

Prior to the post-conviction hearing, Strouth's attorney filed a motion for "appointment and funding of experts and investigators," listing the names of nine proposed "experts" whose assistance he asserted he needed to prepare for the hearing. Eight were located out-of-state and would have testified about various psychological aspects of the death penalty and its application and effect.[1] The ninth person listed was Dr. Kathleen Broughan, described as a Knoxville psychologist with a background in forensic psychology. Counsel relied on the United States Supreme Court's opinion in *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), to support his motion. There the Court, in upholding an indigent defendant's right to the state-funded assistance of a psychiatric expert, noted that "fundamental fairness entitles indigent defendants to 'an adequate opportunity to present their claims fairly within the adversary system.'" *Id.,* 105 S.Ct. at 1094 (citation omitted). The trial judge found that the proposed testimony from the sought-after experts would address questions of law rather than of fact and overruled the motion in its entirety.

Dr. Broughan was the only proposed expert with personal knowledge of this particular case. At counsel's request, she had reviewed the records of the local mental health center where Strouth had been examined prior to his trial. In an unnotarized affidavit, she stated her opinion that the examination had been inadequate. The state successfully objected to the proffer of this affidavit on the grounds that it pertained to a factual issue and that the state had had no opportunity to cross-examine the affiant. The petitioner had not subpoenaed Dr. Broughan but apparently had waited for a decision on the funding request. Defense counsel stated at the hearing that Dr. Broughan's testimony would be that the evaluation had been "insufficient."

On appeal, the petitioner concedes that *Ake* "involved the *trial* right of a defendant to an independent expert," but argues that due process should extend that right to include other criminal or quasi-criminal proceedings.

The state argues in response that there was no abuse of discretion in that Strouth did not demonstrate any prejudice by the trial court's denial of funding. "[T]he em-

---

**1.** Some of these experts had run studies regarding the "prosecution-proneness" of "death-qualified" juries selected pursuant to *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). These are apparently the same studies recently rejected by a majority of the United States Supreme Court in *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Others had published articles disputing the deterrent effect of capital punishment.

ployment of an expert witness at state expense is not authorized or required in the absence of a threshold showing of a denial of due process by the failure to employ such an expert." *State v. Goodman,* 643 S.W.2d 375, 379 (Tenn.Crim.App.1982). The expected testimony of the proposed witnesses was not relevant to any material issue at the post-conviction proceeding, according to the state, because the issues involved had been either previously determined or waived. The state also insists that *Ake* has no application to a post-conviction proceeding.

■ We find that there is no need to determine the applicability of *Ake* to the post-conviction setting. In the first place, the state's argument that the issue of the adequacy of Strouth's mental evaluation has been waived is essentially correct, in that it was not raised at trial or on direct appeal. It might then be argued, of course, that the failure of trial counsel to raise the issue in a timely fashion is just one example of the inadequacy of representation afforded the petitioner at trial.

■ On the other hand, Strouth's post-conviction counsel concedes that our review here is governed by the principles announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to support a grant of relief, *Strickland* requires a demonstration not only that trial counsel's performance fell below an objective standard of reasonableness, but also that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* 466 U.S. at 694, 104 S.Ct. at 2068. In this record, we have only a written statement from Dr. Broughan that Strouth's pre-trial mental evaluation was "insufficient," apparently because it addressed the questions of his competency to stand trial and his sanity at the time of the offense, but not the possibility of mitigating circumstances relevant to his sentence. There is no showing in the record, however, of what an evaluation deemed "sufficient" by Dr. Broughan would have turned up that might have affected the outcome of the sentenc-ing hearing. In the absence of any demonstration of prejudice, we decline to hold that the failure to fund Dr. Broughan's testimony was an abuse of discretion that merits reversal on appeal.

The petitioner next attacks the form of the trial court's order denying post-conviction relief. He first alleges that it does not meet statutory requirements because the findings of fact are not sufficiently detailed and the conclusions of law are sweeping and unsubstantiated. Second, he contends that it improperly incorporates part of the state's memorandum of law filed in the post-conviction proceeding below.

■ It is true that the trial judge frequently generalized that a claim put forward by the petitioner was "unsupported by convincing evidence in the record," or the like. But it is also true that the trial judge in his order commented upon every claim made by the petitioner, and when read together with the very detailed post-conviction petition, the order is sufficiently clear to permit appellate review, even if it lacks desired specificity on some points.

■ The incorporated portion of the state's memorandum discusses the ineffectiveness-of-counsel claim. The petitioner contends that this practice does not represent a detached finding that counsel was effective, but is instead an argument "rife with advocacy-laden hyperbole." The petitioner overstates the case. In fact, the appended part of the state's memorandum appears to be reasonable and balanced in its description and assessment of trial counsel's conduct.

In *Delevan–Delta Corp. v. Roberts,* 611 S.W.2d 51 (Tenn.1981), the Tennessee Supreme Court specifically did *not* condemn party-prepared findings, contrary to the petitioner's contention. The court said that "[f]indings prepared by the trial judge which represent his independent labor are preferable, however we do not disapprove of party-prepared findings," adding that prior to adoption, "the trial judge should carefully examine them to establish that they accurately reflect his views and con-

clusions, and not those of counsel." *Id.* at 53.

The petitioner has failed to show that the statements incorporated were not actually in accord with the trial judge's findings or that they were not correct. Although we do not believe that the trial judge's procedure should be encouraged, we cannot say that the practice prejudiced the petitioner in this case.

■ Finally, the petitioner claims that the trial judge was biased against him and that the judge's lack of impartiality deprived him of a fair hearing. The petitioner's brief cites several examples of allegedly prejudicial conduct by the trial judge, and, in fact, the trial judge did make several remarks that could be interpreted as impatient or rude. However, the issue "is not the propriety of the judicial conduct of the trial judge, but whether he committed an error which resulted in an unjust disposition of the case." *State v. Hawk*, 688 S.W.2d 467, 472 (Tenn.Cr.App.1985). A review of the hearing transcript shows that the majority of the comments were made at the beginning of the hearing, when petitioner's attorney was presenting the motion for funding of experts, discussed above, and other claims found equally meritless by the trial judge. These statements appear to be expressions of exasperation rather than prejudice.

Many of the specific passages quoted in the petitioner's brief have been taken out of context. Omitted from the brief are the statements that triggered the particular remarks and any subsequent explanations for them, many of which were reasonable. In fact, it appears that counsel was moving very slowly and in some instances covering the same ground repeatedly. It is clear that the trial judge wanted him to get to the point, but there is no evidence of bias.

The petitioner quotes extensively from *Leighton v. Henderson*, 220 Tenn. 91, 414 S.W.2d 419 (1967), in support of his contention that the trial judge should have recused himself. There a trial judge stated, prior to the hearing, that he would grant a habeas corpus petition regardless of the proof in the case. The Supreme Court ruled that the trial judge committed reversible error when he heard the cases after expressing himself as he did. *Id.* 414 S.W. 2d at 420–421. The remarks offered by the petitioner in this case do not rise to the level of bias demonstrated in *Leighton,* and the two cases are clearly distinguishable on the facts.

■ The petitioner's argument that the trial judge should have recused himself because he was a potential witness to the method of jury selection utilized at trial is also without merit. Tennessee law provides that a judge is a competent witness in any case tried before him. T.C.A. § 24–1–205; *State ex rel. Phillips v. Henderson,* 220 Tenn. 701, 706–707, 423 S.W.2d 489, 492 (1968).

In summary, we find no merit to the petitioner's contention that he was denied a full and fair hearing on his post-conviction petition. We thus turn our attention to the substance of his claims.

### 2. *Effective Assistance of Counsel at Trial*

The most significant of the petitioner's claims is that he was denied the effective assistance of counsel at trial, primarily because of trial counsel's failure to investigate and prepare his case adequately.

Larry Dillow was initially appointed to represent Strouth at his preliminary hearing in March, 1978. He was reappointed at Strouth's arraignment in June of that year and acted as lead counsel throughout the trial and appeal. Klyne Lauderback was appointed to Strouth's case on August 1, 1978, after Dillow sought him out and asked for assistance in selecting the jury. Patrick O'Rourke, staff counsel for the Nashville-based Southern Prison Defense Committee (SPDC), came into the case on August 27, 1978, one day before trial began. His principal interest was in the sentencing phase. Neither Lauderback nor O'Rourke played any substantial part in pre-trial investigation or in the filing of pre-trial motions.

Lauderback testified at the post-conviction hearing that the main defense strategy

was to avoid imposition of the death penalty. This strategy was certainly not an unreasonable one, given the circumstances of the case. Strouth and his co-defendant, Jeffrey Stuart Dicks, were charged with killing Jimmy Keegan, the proprietor of the Budget Shop in downtown Kingsport, during a robbery. The facts surrounding the killing showed that Keegan had been knocked unconscious with a blunt instrument, and then, as he lay on the floor, his throat had been slit literally from ear to ear. His pockets had been emptied of a large roll of money he habitually carried, and several items were missing from the store.

Strouth and Dicks had been seen in the area of the store and were eventually arrested and charged with Keegan's murder. Each made a pre-trial statement to police acknowledging his presence at the scene but accusing the other of killing Keegan. For this reason, they were tried separately. Evidence accumulated by the police and introduced at trial tended to show, however, that Strouth was the one who had actually cut the victim's throat.

Although found to be competent and not insane by medical personnel who examined him, Strouth apparently led an active fantasy life. He told others, including trial attorney Larry Dillow, that he was an Apache Indian chief from a tribe in Arizona and that he had no family left alive. He claimed to have Mafia connections and said that he and his since-deceased sister had once been foreign mercenaries. He was known to his friends as "Chief."

When explored, all or nearly all of these statements turned out to be false, but his lawyer spent an unfortunate amount of time and effort investigating Strouth's claims, in the vain hope that as an Apache official Strouth would not be subject to state court jurisdiction, or that the circumstances of his upbringing might be admissible in mitigation of a possible death sentence.

In fact, Strouth had been born to Caucasian parents in Maryland and raised there. His mother found out about the trial when a relative in Tennessee sent word to Strouth's sister, who also lived in Maryland. His mother was able to attend the last few days of the trial, although, at Strouth's insistence, she was never called to testify.

Regarding the requirement of pre-trial investigation, the Tennessee Supreme Court has recently noted that "[d]efense counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. A particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn.1986), citing *Strickland v. Washington, supra*, 466 U.S. at 691, 104 S.Ct. at 2066.

■ The petitioner says that by not interviewing every potential witness prior to trial, Dillow failed to discover (1) alleged discrepancies in the identification of Strouth by witnesses who placed him near the scene of the crime and (2) alleged improprieties concerning the testimony of Strouth's friends. However, Strouth admitted that he was in the area at the time of the murder, but offered no other explanation for his presence, and the friends testified at the post-conviction hearing that their testimony at trial had been truthful.

At the post-conviction hearing, Dillow listed several reasons why he did not interview each of the potential witnesses prior to trial. First, the prosecutors had told him in general about the expected testimony of the witnesses. Most of it was from people in the community who had seen Strouth and Dicks in the vicinity of the crime or had noticed them coming and going from Dicks's apartment. He felt it "would have been futile to get into the identification part." We agree that such a tactic would have been useless. The state could always fall back on Strouth's own admission that he was at the scene of the crime.

Second, Dillow wasted a lot of time investigating Strouth's family background as Strouth described it—the "orphaned Indian chief" story. As noted previously, Dillow

requested and was granted a mental evaluation of Strouth, but the evaluation did not result in a finding of insanity or incompetency. Dillow himself believed that Strouth was merely uncooperative, not insane.

Third, Dillow was given copies of statements made to police by Strouth, Dicks, and Strouth's girlfriend, Barbara Davis, prior to trial. Barbara Davis wanted to help Strouth and asked Dillow to coach her in preparation for her testimony. She cooperated with Dillow, and he spent a lot of time with her. In the end, she made a very effective witness for the state, and Dillow cross-examined her only perfunctorily, because he knew that her testimony could have been even more damaging to his client than it was.

Dillow's explanations for his failure to investigate are reasonable in light of the time constraints imposed by the trial schedule, the "open file" policy of the local district attorney, and the petitioner's lies. The attorney's actions did not constitute ineffective assistance. *See State v. Harbison, supra.*

Strouth says that Dillow was also ineffective because of his inexperience with major criminal trials. He cites as one example Dillow's lack of knowledge at trial about the proper way to attack the warrants showing Strouth's prior arrests, but he has failed to demonstrate any actual problems with them. Dillow said that although this was his first capital case, he had practiced law for 12 years and that about half of his case load was criminal. He examined most of the physical evidence prior to trial. He obtained form motions on the death penalty from the SPDC and filed those he thought had relevance. He filed a motion to suppress Strouth's statement to police. He did not obtain Strouth's juvenile records from Maryland or locate Strouth's family prior to trial because he had no knowledge of Strouth's connections there. Dillow incompletely and unsuccessfully moved for a change of venue, but he was successful in excluding gruesome photos of the victim from the trial. In terms of pretrial investigation, Dillow said he was surprised only by the testimony of Jeffrey McMahan, a friend of Strouth's from North Carolina whose name was supplied by the state prior to trial.

Strouth nevertheless belittles Dillow's pretrial work and says it was unreasonable. He insists that an interview with McMahan would have revealed that books were the source of the "orphaned Indian chief," "Mafia hit man," and "foreign mercenary" stories. Strouth argues that Dillow should have contacted Strouth's lawyer from a North Carolina conviction for committing a crime against nature. He says the North Carolina lawyer could have told Dillow that Strouth's guilty plea was a "best interest" plea and would have given Dillow the means to contact Strouth's family.

Strouth also makes much of Dillow's failure to discover Strouth's Maryland juvenile record (later obtained by his family for the post-conviction hearing) and the alleged characterization in those records of Strouth as a "youngster with impaired reality contact with concomitant distortion of ongoing perception." (The Maryland records actually say that in 1972, there were "indications of impaired reality contact," etc.) A psychiatric evaluator concluded at one point that Strouth was intellectually rather bright but "lonesome, unhappy, moderately troubled and emotionally slightly disturbed." His appearance and his home life were blamed. Another examiner noted that Strouth had lied to him during interviews.

Dillow was not a perfect lawyer, but his actions were not unreasonable. There was no real dispute about Strouth's presence at the scene. Strouth lied about his background, but his unfortunate childhood did not affect his guilt or innocence of the crimes with which he was charged. The juvenile records were received by the state during the trial, and Dillow was given copies at that time.

Despite the time constraints, Dillow felt that the defense team was adequately prepared for trial when the time came. It is difficult to see what further steps could have been taken if a continuance had been sought and granted, other than an investi-

gation of Strouth's contacts in North Carolina.

But even if this oversight is held to be unreasonable, relief can only be granted if the petitioner can also prove prejudice. In this regard, we start with the proposition that the evidence was clearly sufficient to sustain the conviction. *State v. Strouth, supra; see State v. Harbison, supra,* 704 S.W.2d at 319.

In an attempt to show that the failure to investigate resulted in prejudice, Strouth first claims that several of the numerous identification witnesses made inconsistent statements and that the rest were victims of "herd thinking." In view of his own pre-trial admission, this argument is simply too weak to stand.

■ The petitioner next attacks the testimony of Barbara Davis, Betty Dicks, and Jeffrey McMahan. He claims prejudice resulted from trial counsel's mishandling of these witnesses.

Barbara Davis was Strouth's girlfriend at the time of the crime. She testified that she told police that on the day of the crime Strouth had given her some items taken from Jimmy Keegan's store, the Budget Shop, and had admitted to her his involvement in the robbery. She helped the police locate a pair of Strouth's jeans that had blood spattered on them, retrieved the coat from the Budget Shop that Strouth had given her, and gave police the automobile registration papers for the car that Strouth and Dicks bought after the robbery. As noted above, at trial defense counsel cross-examined Davis only very briefly, because they knew that she believed Strouth was guilty, and they did not want to risk having her tell the jury that Strouth should be punished for what he had done.

Strouth now says that Davis had been threatened with the electric chair herself if she did not testify, and that Dillow did not investigate and therefore could not impeach her with this motivation for her testimony. In addition, Strouth says that the district attorney lied when he said he knew of no exculpatory evidence. Because he did not reveal the alleged threat or agreement not to prosecute, Strouth says, the state breached its obligation to provide exculpatory evidence.

When questioned at Dicks's trial, held after Strouth's, Davis stated that she had not testified voluntarily before the grand jury investigating the case, but testified only because a TBI officer had told her "to quit playing games" or she "could get the same sentence that Chief got for just helping him." Davis's testimony to the grand jury obviously occurred prior to Strouth's trial, conviction, and sentencing, so "the same sentence Chief got" was not necessarily the death penalty at that time. The petitioner offers no other proof to support his allegation of coercion. There was no evidence of any threat in connection with Davis's trial testimony. Dillow said that, in his opinion, her original statement to police had been voluntary. (Davis did not testify at the post-conviction hearing because she was a patient in a mental health facility at that time.)

Betty Dicks was Jeffrey Dicks's girlfriend at the time of the crime, but had married him prior to Strouth's trial. The petitioner now argues that she was obviously biased in favor of her husband, Dicks, and that she had been promised lenient treatment for him in return for her help. However, her testimony implicated both men, not just Strouth. For instance, at Strouth's trial she testified that at 11:30 a.m. on the day of the crime, the petitioner and Dicks had two watches, a coat, and a calculator taken from the Budget Shop. Her trial testimony included other bad acts. The jury undoubtedly realized that she might want to shield Dicks—she usually referred to him at trial as "my husband." She testified that she was unaware of any agreement by which her testimony against Strouth would benefit her husband.

At the post-conviction hearing, Betty Dicks testified that at the time she made her statement to police when Dicks turned himself in, one of the officers told her that he believed Dicks would be charged only with accessory after the fact and would get three to six years in prison. Strouth's statement, in which he said Dicks actually killed the victim, was read to her before

she gave her statement. She knew at that time that Dicks had been indicted and charged with first degree murder. She said that at the time of Strouth's trial, she still believed Dicks would get only three to six years as an accessory, even though her mother-in-law, Shirley Dicks, with whom she was living, thought Dicks would be sent to the electric chair. Finally, Betty Dicks testified that what she had said at Strouth's trial was the truth.

Strouth had lived in North Carolina with Jeffrey McMahan's family for a few months during the year prior to the crime. Strouth went to see McMahan after the crime. McMahan testified at trial that Strouth told him then that he had killed a man. Later, McMahan, Betty Dicks, and Shirley Dicks stayed at the same motel during the trial and discussed McMahan's testimony. At that time, the Dickses apparently offered McMahan money and sex to testify that Jeffrey Dicks had not done the killing.

In a deposition taken in 1982 for Dicks's post-conviction hearing, McMahan testified that he had been offered money and accepted the offer, because "[y]ou know, no man is going to turn down a thousand bucks for telling the truth." At the time of Strouth's hearing, he had not yet received the money, nor did he expect to get it. He said he did not notify anyone of the offer because "I knowed the people wasn't going to come across.... I never expected them to pay me anything." He said he told Shirley Dicks that he "was just going to tell them what the man [Strouth] said to me."

About the only thing that a pre-trial interview with McMahan might have uncovered that would have had potential impeachment value was the fact that McMahan was taking drugs at the time he and Strouth discussed the Kingsport murder. Indeed, McMahan's recollection at trial was that Strouth had told him the killing occurred in Wilmington, North Carolina. Given the overwhelming nature of the other evidence of Strouth's guilt, we are confident that effective impeachment of McMahan's testimony, by whatever means, would not have affected the outcome of the trial.

The petitioner has not shown a reasonable probability that any of the witnesses could have testified differently but for counsel's conduct in failing to interview all witnesses prior to trial, or that significant impeachment testimony was lost thereby. Proof that Strouth was a chronic liar would not negate the physical evidence, including recovery of the items taken from the store, the stolen cash, and Strouth's blood-spattered jeans. He has not shown prejudice requiring reversal, and the trial judge did not abuse his discretion when he found that counsel had rendered effective assistance at trial under the standards mandated by *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1974).

### 3. *Effective Assistance of Counsel at the Sentencing Hearing*

■ In respect to the penalty phase of trial, the petitioner reiterates his contention that trial counsel failed properly to investigate his case.

He focuses on (1) the admission of the North Carolina conviction; (2) the testimony about the petitioner's boasts of criminal connections; and (3) the failure to introduce "the extensive mitigating evidence" found in the Maryland juvenile records to the effect that Strouth was a liar and that his childhood had been unhappy.

As pointed out in the previous section, much of this information came to light very late in the case because of Strouth's failure to communicate it to his attorney. In any event, the North Carolina and Maryland records were apparently rejected by the jury as bases for the imposition of the death penalty, as further discussed below, in favor of two other aggravating factors. Moreover, the mitigating circumstances offered by the petitioner were not especially significant. Lying about other activities does nothing to change the facts in this particular case, and while many people have unhappy childhoods, few murder an unconscious victim during the course of a robbery.

The state also points out that Strouth's exculpatory statement was introduced as a mitigating factor during the sentencing

phase of the trial and that Strouth refused to let counsel call his mother to testify about his difficulties as a child. All in all, we fail to find the degree of prejudice necessary to set aside the penalty, based on counsel's conduct alone.

### 4. *Failure of State to Reveal Exculpatory Evidence—Brady Violation*

Strouth contends that the state failed to reveal exculpatory evidence prior to trial, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He says the state withheld information about the electric chair threat to Barbara Davis, the lenient-treatment-for-Dicks promise to Betty Dicks, the discrepancies in the statements of identification witnesses, and the existence of other suspects.

In establishing a *Brady* violation, a defendant must prove: (1) the prosecutor's suppression of evidence, (2) the favorable character of the suppressed evidence for the defense, and (3) the materiality of the suppressed evidence. *United States v. Sink,* 586 F.2d 1041, 1051 (5th Cir.1978), *cert. denied,* 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979). In the instant case, the record fails to show that the state suppressed the evidence or that the evidence was favorable or material.

The allegations about Barbara Davis and Betty Dicks were not supported by the record, as noted above. The discrepancies in the identification witnesses' statements were minor, and counsel testified that he was aware of the substance of the statements prior to trial. The statement of the victim's widow, in which she mentioned others who might have had a motive to rob the victim, was not suppressed. Dillow testified that he was aware of the contents of her statement prior to trial.

There is no merit to this issue.

### 5. *Failure to Give a Proper Jury Charge—Enmund Violation*

Strouth argues that the Tennessee death penalty scheme is constitutionally unsound because it does not require a specific jury finding that the defendant personally killed or intended to kill, citing *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). He insists that his death sentence is void because of this flaw. The state responds that this issue could reasonably have been anticipated at the time of the direct appeal, and, therefore, has been waived by the failure to raise it then.

The defendant's challenge is not supported by law. Strouth bases his contention that the *jury* must find intent or personal liability on (1) his assertion that Tennessee has yet to consider the issue, and (2) the decision he anticipated in *Bullock v. Lucas,* 743 F.2d 244 (5th Cir.1984), *cert. granted sub nom., Cabana v. Bullock,* 471 U.S. 1052, 105 S.Ct. 2110, 85 L.Ed.2d 476 (1985), then pending. As it turns out, he was misguided on both counts.

The petitioner has overlooked *State v. Sheffield,* 676 S.W.2d 542 (Tenn.1984), in which the Tennessee Supreme Court examined the defendant's "proposition that the death penalty cannot be imposed absent a specific finding that the defendant took or intended to take the life of the deceased." *Id.* at 551. The Court rejected the argument and concluded that *"Enmund* does not require a jury instruction or a specific verdict to that effect, as contended by defendant, and there is no merit to this issue." *Id.*

Furthermore, on January 22, 1986, the United States Supreme Court released its opinion in *Cabana v. Bullock,* 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986). There, the Court reviewed the rule in *Enmund, supra,* that a defendant "who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed" cannot receive the death penalty, *Enmund, supra,* 458 U.S. at 797, 102 S.Ct. 3376–3377, in order "to determine in whose hands the decision that a defendant possesses the requisite degree of culpability properly lies." *Cabana v. Bullock, supra,* 474 U.S. at 378, 106 S.Ct. at 693. The Court noted that while "[a] defendant charged with a serious crime has the right to have a jury determine his guilt or inno-

cence," citing *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), that defendant has no constitutional right to a jury determination of the appropriate punishment, even capital punishment, citing *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). *Cabana v. Bullock,* 474 U.S. at 385–386, 106 S.Ct. at 696–697. According to the Court, *Enmund* did not add any new element to the offense of murder but merely placed a substantive limitation on punishment. *Id.* Therefore, the Court concluded, a reviewing court may appropriately make the finding that a defendant possesses the degree of culpability necessary to satisfy *Enmund. Id.*

In *Cabana v. Bullock,* there was evidence that the defendant had merely aided the actual killer. The Court found that the meager remarks by the Mississippi Supreme Court about Bullock's participation in the crime were not sufficient to constitute a finding that the defendant killed, attempted to kill, or intended to kill the victim. *Id.* 474 U.S. at 389. Because no state court had made this essential finding, the case was remanded to the Mississippi state courts for such a determination. *Id.* 474 U.S. at 392.

Strouth did not question the sufficiency of the evidence against him on his direct appeal, and the Tennessee Supreme Court recited only the basic facts of the case in its opinion. *State v. Strouth, supra,* 620 S.W.2d at 469. The Court did not say directly that Strouth had personally committed the murder. In its Opinion on Petition to Rehear, the Court did state that "appellant and his companion" struck the victim and slit his throat. And in *State v. Dicks,* 615 S.W.2d 126 (Tenn.1981), the Court discussed evidence that both men had been in the store and had participated in the crime. *Id.* at 130.

In his Memorandum Opinion in *Jeffrey Stuart Dicks v. State of Tennessee,* the trial judge (who presided over the trials and post-conviction hearings of both co-defendants) wrote that he thought "Dicks's execution should not precede that of the co-defendant Donald Wayne Strouth be-

cause of the evidence in both cases which leads to the conclusion that Mr. Strouth personally inflicted the fatal wound."

In his Memorandum Opinion in the instant case, the same judge addressed the petitioner's *Enmund* argument and found that *Enmund* had not been violated. In a footnote to that section, he added: "The evidence is such that any rational trier of fact would find that Petitioner Strouth personally killed the victim by slashing his throat while the victim was unconscious from a non-lethal blow to his head." The petitioner refers to this sentence as the trial court's "own gratuitous fact-finding," but we conclude that it is enough to satisfy the requirements of *Cabana v. Bullock, supra.*

Moreover, we find that there is ample evidence that the petitioner actually killed the victim. Strouth boasted that he had slit a man's throat, told friends that Dicks "froze" on him, and disposed of his own knife and blood-spattered pants. The *Cabana* opinion notes that "[a]t what precise point in its criminal process a State chooses to make the *Enmund* determination is of little concern from the standpoint of the Constitution." *Cabana v. Bullock, supra,* 474 U.S. at 386. Hence, even if the trial judge had not made the finding set out above, we could make the requisite finding ourselves, and we do so. It follows that the record is not *Enmund*-deficient.

6. *Errors at the Sentencing Hearing*

The petitioner raises several issues with regard to alleged errors occurring during his sentencing hearing. He argues, for example, that the Tennessee death penalty statute, T.C.A. § 39–2–203(c), properly allows admission of an unlimited number of mitigation factors, but should not be used to permit introduction of aggravating circumstances not specifically listed in T.C.A. § 39–2–203(i). Strouth says evidence of his prior convictions and extraneous statements was impermissibly admitted against him.

The state responds that the issue has been waived because it was not raised on direct appeal. The petitioner attributes

this omission to trial counsel's incompetence. If the question is still reviewable on the latter basis, we nonetheless find that any error in this regard is harmless, because the petitioner has failed to show that it affected the outcome of the sentencing hearing.

The basis of the complaint is the prosecution's introduction of Strouth's juvenile record, his prior conviction for crime against nature, and testimony elicited from witness Jeff McMahan that Strouth told him he had "robbed quite a few stores and the only way he did it was leave an empty cash register and dead bodies."

■■■■ Although it may have been error to allow testimony about Strouth's boasts of criminal activity and about his juvenile record, we conclude that the error is not of such magnitude that it requires reversal. *State v. King*, 718 S.W.2d 241, 248 (Tenn.1986); *see also State v. Harries*, 657 S.W.2d 414, 421–22 (Tenn.1983). Concerning the felony conviction for crime against nature, the petitioner argues that the offense does not necessarily involve violence against the person and thus may have been introduced in violation of T.C.A. § 39–2–203(i)(2), which permits the jury to consider as an aggravating factor the defendant's conviction for any prior felony involving violence or the threat of violence to the person. We note, however, that in the affidavit submitted by the North Carolina attorney who represented Strouth, counsel states that the evidence of sodomy against Strouth was weak and that he entered a "best interest" guilty plea. The attorney does *not* assert that the offense was in any manner consensual or otherwise non-violent.[2] We think this omission is of controlling significance and conclude that the petitioner has failed to demonstrate a violation of T.C.A. § 39–2–203(i)(2).

Moreover, and more importantly, the jury did not rely on T.C.A. § 39–2–203(i)(2) as one of the aggravating factors in impos-

ing the death sentence. Instead, the jury specifically based its decision on two other statutory aggravating circumstances, T.C.A. §§ 39–2–203(i)(5) ("especially heinous, atrocious, or cruel") and (i)(7) ("committed during course of robbery"). Furthermore, the trial transcript indicates that Strouth's co-defendant, Dicks, was known to the victim, who may well have been murdered merely to prevent identification of his assailants, a fact which would constitute an aggravating circumstance under T.C.A. § 39–2–203(i)(6), although this theory was not argued to the jury. In any event, the jury found two aggravating circumstances related to the crime itself and no mitigating circumstances to counterbalance them. Based on this finding, the death penalty was properly imposed. T.C.A. § 39–2–203(g). We thus find no reversible error in the introduction of the extraneous evidence about which the petitioner now complains.

■■■■ Next the petitioner alleges error in the trial court's failure to define the terms "heinous, atrocious, or cruel," as constituting one of the aggravating circumstances upon which the death penalty was based under T.C.A. § 39–2–203(i)(5). On direct appeal the Tennessee Supreme Court rejected the argument that the statute gave the jury "unguided and unrestrained" discretion in imposing the death penalty. *State v. Strouth*, 620 S.W.2d at 470. The petitioner now says this determination was in error, relying upon *State v. Williams*, 690 S.W.2d 517 (Tenn.1985), as intervening case law.

*Williams* involved a murder committed during a robbery. On direct appeal, the court remanded the case for a new sentencing hearing, based on a *Bruton* violation and other errors. One of the other errors was the failure to instruct the jury properly about the relevant statutory and legal definitions of several felonies and other legal terms. The *Williams* court noted "that the court did not instruct the jury

---

**2.** Sexual assault on a man is not classified in North Carolina as rape. Rape is defined in terms of vaginal intercourse. At the time of Strouth's plea, such an attack was presumably punishable only as a "crime against nature."

The statutes were amended in 1980 to create the crime of "sexual offense," N.C.Gen.Stat. §§ 14–27.4 and .5, which specifically excludes vaginal intercourse.

concerning the legal significance of the words 'heinous,' 'atrocious,' 'cruel,' 'torture,' or 'depravity of mind' as those terms are used in the aggravating circumstance defined in T.C.A. § 39–2–203(i)(5)." *Id.* at 532. After discussion of the legal meanings of these terms, the Court found insufficient evidence of "torture" (the victim had been killed first, mutilated second), but possible evidence of "depravity of mind," and left the final determination to the jury on remand. *Id.* at 525–531. The Court found the statute to be constitutional "so long as the abstract terms employed therein are construed and interpreted as we have done in this opinion and other opinions of this Court." *Id.* at 533. Jury instructions on the definitions are important, according to the Court, to preclude "a basically uninstructed jury" that "cannot lawfully impose the death penalty," citing *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). *Williams,* 690 S.W.2d at 533. Retroactive application was not mentioned.

In *State v. Zagorski,* 701 S.W.2d 808 (Tenn.1985), decided six months after *Williams,* the defendant appealed the imposition of the death penalty based on the same two aggravating circumstances as in the instant case. Citing *Williams,* 690 S.W.2d at 529–530, but with no comment on the jury instructions, the Court agreed with the jury finding that the murders had been "especially heinous, atrocious or cruel." The defendant had slit the victims' throats after shooting them, and left them "to bleed to death in the woods. This evince[d] depravity of mind and [was] a form of torture[,] ... an infliction of gratuitous violence, and needless mutilation of victims who were already helpless." 701 S.W.2d at 814. The Court also rejected the defendant's contention that T.C.A. § 39–2–203(i)(5) was unconstitutionally vague. *Id.* 701 S.W.2d at 816.

In its Opinion on Petition to Rehear in Strouth's direct appeal, the Tennessee Supreme Court wrote:

> Appellant and his companion-in-crime, Jeffrey Dicks, struck James Keegan on the head with a rock, rendering him unconscious. While Mr. Keegan was in an unconscious state, appellant and his companion slit Mr. Keegan's throat and left him to bleed to death—a cold-blooded, intentional, conscienceless and pitiless act. An act which can only be characterized as heinous and atrocious, and one which evinces a depraved state of mind and justifies the imposition of the death penalty, no mitigating circumstance being shown.

If the court found it unnecessary to give retroactive application of the *Williams* definitional jury instruction requirement in *Zagorski, supra,* we conclude that it is likewise unnecessary to do so in this case.

▓▓ In attacking the basis for his sentence, the petitioner also contends that because he was convicted of murder in the perpetration of a robbery, the fact of the robbery cannot be used as an aggravating circumstance in imposing the death penalty. This argument was rejected in *State v. Pritchett,* 621 S.W.2d 127, 140–141 (Tenn. 1981). The Tennessee Supreme Court has most recently followed that holding in *State v. Zagorski, supra,* 701 S.W.2d at 816, a case decided subsequently to the contrary Eighth Circuit case upon which the petitioner relies, *Collins v. Lockhart,* 754 F.2d 258 (8th Cir.1985), *cert. denied,* 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985). In addition, *Collins v. Lockhart* involves Arkansas's slightly different statutory scheme, and we therefore decline to follow the Eighth Circuit's opinion on this point.

The petitioner next claims that removing *Witherspoon* jurors from his jury panel created a "death-prone jury." Although this argument was rejected on direct appeal, *State v. Strouth,* 620 S.W.2d at 472, the petitioner now relies on the subsequent case of *Grigsby v. Mabry,* 758 F.2d 226 (8th Cir.1985), to support his contention. However, the United States Supreme Court overturned *Grigsby* on May 5, 1986, *sub nom. Lockhart v. McCree,* and ruled that "there is no constitutional impediment to removing, prior to the guilt or the sentencing phase, so-called 'Witherspoon-excludable' jurors." 476 U.S. 162, 106 S.Ct. 1758,

90 L.Ed.2d 137 (1986). Moreover, the Tennessee Supreme Court had previously declined to follow *Grigsby v. Mabry* in *State v. Harbison, supra,* 704 S.W.2d at 318.

Challenging the propriety of the state's closing argument, the petitioner argues that the district attorney told the jury that the prosecutors were "experts" who knew that the death penalty was appropriate for this crime, thereby usurping the responsibility of the jury and impairing the petitioner's constitutional rights. The petitioner asserts that the Tennessee Supreme Court had previously incorrectly determined this issue on direct appeal, and cites *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), as intervening case law.

At trial, each of the two prosecutors made a reference to the rarity of asking for the death penalty. No objection was made to the first remark. An objection to the second, that the prosecutor had been with the district attorney's office for 13 years, was sustained, and a curative instruction to disregard matters not in evidence was immediately issued.

The conduct in *State v. Harries,* 657 S.W.2d 414 (Tenn.1983), was very similar to the second situation here. The Court noted the trial court's curative instruction and dismissed the issue. It ruled that "[t]he district attorney's statement was clearly improper but the prompt action by the trial judge prevented any prejudice to defendant in our opinion. The evidence of guilt and of aggravating circumstances was overwhelming and the error was of a minor nature and harmless beyond a reasonable doubt." *Id.* at 421. The same can be said in this case.

*Caldwell, supra,* addresses a different type of argument and is not applicable here. In *Caldwell,* the jury was led to believe, by the prosecutor's argument, that responsibility for determining the appropriateness of a death sentence rested not with the jury, but with the court system.

### 7. *Other Matters Previously Determined or Waived*

Finally, the petitioner raises for the record several issues which either were addressed on direct appeal or could have been raised at that time but were not. Under T.C.A. § 40–30–112, these matters would normally be considered previously determined or waived and thus not subject to further review in a collateral action of this type.

For example, the petitioner complains that he was denied the opportunity to rebut the aggravating circumstances upon which the state relied at sentencing, because the state did not tell him about them prior to trial. A similar argument was rejected on direct appeal. *State v. Strouth, supra,* 620 S.W.2d at 470. The petitioner now relies on Tennessee Rule of Criminal Procedure 12.3, which became effective August 22, 1984. Prior to that time, a defendant in a capital case was considered to be put on notice by the statute itself, although formal notice was recommended. *See State v. Berry,* 592 S.W.2d 553, 562 (Tenn.1980). The Comment to the 1984 amendment points out that notice was "perhaps not constitutionally required." We find no need to give retroactive application to this rule change.

Strouth now says that his pre-trial mental competency evaluation in 1978 was inadequate, and that it may not have been conducted in accordance with the then-recent case of *Graham v. State,* 547 S.W.2d 531 (Tenn.1977). The state says this issue was waived because it was not presented in the direct appeal. We agree. Moreover, the record demonstrates that the evaluators were in fact employing *Graham* type standards at the time of Strouth's examination. And, as previously noted, there is no proof in the record, nor even an assertion by counsel, that Strouth's mental evaluation failed to turn up further evidence that would have affected the jury's verdict in any way.

The petitioner next objects to a jury instruction that he says prejudicially misstated the law in Tennessee regarding admissions. No objection was made at trial, but the petitioner insists that the failure to object is evidence of his ineffective assist-

ance claim and that the matter is therefore not waived. We need not decide the waiver issue, because the petitioner is plainly wrong on the merits. As the trial judge indicated in his order below:

The Court did not characterize Petitioner's extra-judicial statements as "admissions" but left the issue to the jury, also telling the jury that "casual conversations and extra-judicial statements or conversations are regarded as the weakest of evidence." This was a beneficial instruction to Petitioner and was not error or a comment on the evidence. Trial counsel wisely did not object.

The issue has no merit.

Raising the typical constitutional challenges to his sentence, the petitioner further argues generally that the death penalty is "cruel and unusual" because it is arbitrarily and discriminatorily applied. Similar arguments have been consistently rejected in Tennessee, most recently in *State v. Harbison, supra,* 704 S.W.2d at 318. He also contends specifically that the sentencing phase of the trial did not clearly allocate the burden of proof to the state. The state responds that this argument has been rejected in numerous cases, including Strouth's direct appeal. *State v. Strouth, supra,* 620 S.W.2d at 470. We note, in fact, that the Tennessee Supreme Court has never taken the occasion to discuss at any length the due process implications of a statute like Tennessee's that requires a jury to find that statutory aggravating "circumstance or circumstances are outweighed by one or more mitigating circumstances" in order to impose a life sentence. T.C.A. § 39–2–203(f). In this case, however, the possible burden-shifting aspect of that statutory requirement is largely moot, given the petitioner's inability to produce evidence of any substantial mitigating factors, either at trial or at his post-conviction hearing. We therefore decline to consider reversal of his sentence on this basis.

The evidence of Strouth's guilt is overwhelming. If the defense he received at trial was not model, it was certainly not grounds for a finding of ineffective assistance. Despite errors at the sentencing hearing, we find none so substantial as to require post-conviction relief. The judgment of the trial court denying such relief is therefore affirmed.

DWYER, J., and WILLIAM S. RUSSELL, Special Judge, concur.