# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 23, 2010 Session

## STATE OF TENNESSEE v. MICHAEL MAPLES

**Appeal from the Criminal Court for Hamblen County**
**No. 07CR889     John Dugger, Judge**

---

**No. E2009-00400-CCA-R3-CD - Filed July 27, 2010**

---

The Defendant, Michael Maples, was convicted by a Hamblen County Criminal Court jury of one count of facilitation of aggravated assault, a Class D felony, and one count of aggravated burglary, a Class C felony. He was sentenced as a Range I, standard offender to four years and six years, respectively, to be served concurrently in the custody of the Department of Correction. In this appeal as of right, he argues that the trial court erred in denying his motion for a mistrial based upon the State's failure to provide exculpatory evidence pretrial. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Jonathan M. Holcomb, Morristown, Tennessee, for the appellant, Michael Maples.

Robert E. Cooper, Attorney General and Reporter; John H. Bledsoe, Senior Counsel; C. Berkeley Bell, District Attorney General; and Kevin Keeton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The victim, Rafael Cevantes-Velazquez, testified that he and his girlfriend, Candice Levi, were sitting in their living room at approximately 11:00 p.m. on November 2, 2007, when three people suddenly "barged in" through the front door. He remembered that the Defendant, an African-American man, and a woman named Tinneka entered their living room. The Defendant, armed with a large knife, chased the victim and swung at his face with the knife. The victim said that he tried to dodge the knife but was struck across the right

cheek. As the victim fled from the apartment, he attempted to grab the knife and also injured his hand. The victim said that he was bleeding and afraid. He also recalled that the African-American man followed him from the apartment but abandoned his pursuit when he saw the victim with his cellular telephone. The victim hid outside until he saw all three individuals leave in a black car.

The victim testified that he saw a car approaching and walked out into the street for help. The driver stopped and took the victim back to his apartment where the victim's girlfriend was talking to a 9-1-1 operator. The police and an ambulance soon arrived. The victim was sent via helicopter to a Knoxville hospital where he required surgery for the injury to his cheek.

The victim testified that he was in the United States illegally and used the name, Fernando Coppo, to maintain employment at a Newport manufacturing facility. At the time of trial, he and his girlfriend had been dating for almost four years. He admitted he had previous convictions for vandalism and public intoxication that arose from when he broke down the door of the home his girlfriend shared with her mother, Tammy Nash, sometime in the summer of 2007. He also testified that he had met the Defendant once prior to the assault and knew the Defendant as Ms. Nash's boyfriend.

Michael Georgio, Jr. testified that he was driving home from work at approximately 11:30 on the night of November 2 when a man with a cut across his face walked out to the middle of the road. He described the victim as "kind of bloody" and gave him a sweatshirt to hold on his wound as they returned to the victim's apartment. Mr. Georgio said that when they arrived at the apartment, Ms. Levi was hysterical and trying to talk to a 9-1-1 operator. Mr. Georgio took the telephone from Ms. Levi and spoke to the 9-1-1 operator.

Hamblen County Sheriff's Office Deputy Chad Mullins testified that he arrived at the apartment at 12:31 a.m. on November 3. The ambulance crew was already there and had called for the helicopter to transport the victim to Knoxville. Officer Mullins spoke only to Ms. Levi who told him that the Defendant broke into the house and cut the victim.

Candice Levi testified consistently with the victim's account of the assault. She said that the people broke down their door. She was certain that the Defendant cut the victim and that Tinneka Seals, her mother's neighbor, stood in the doorway and told the Defendant that they needed to leave. Ms. Levi did not see the African-American man, later determined to be Victor Kyle, Ms. Seals's boyfriend. She testified that Ms. Seals drove a black Pontiac Sunfire. She did not actually see the victim get cut, but she saw the blood on his face as he ran from the apartment. Ms. Levi explained that her ten-year-old son, Dakota, was upstairs

-2-

and that she was concerned for his safety during the assault. She said that before the Defendant left, he told her to stay away from Ms. Nash. Ms. Levi said that her relationship with her mother was not good and that she only maintained contact with her so that Dakota could spend time with his grandmother. Ms. Levi said that she was scared throughout the incident and that as soon as the Defendant left, she called 9-1-1 but could not leave the apartment because her son was upstairs. She also recalled that one of the intruders left a liquor bottle.

Hamblen County Sheriff's Office Detective Michael Hayes testified that he was called to the victim's apartment after Deputy Mullins completed his initial inquiries. He described a small white car outside with "quite a bit of blood" on it. He said that the front door was "busted" open and there was blood on the couch cushions. Ms. Levi and her son were at the apartment, but the victim had already been transported to the hospital. He described Ms. Levi as "quite shaken." A liquor bottle found at the scene was examined by latent fingerprint experts at the Tennessee Bureau of Investigation who identified the fingerprints of Victor Kyle. Detective Hayes presented photographic lineups separately to the victim and Ms. Levi; both identified the Defendant as the man who assaulted the victim.

In a statement to Detective Hayes, the Defendant said the victim and Ms. Levi had "busted the windows out" of Ms. Nash's house and "whipped" Ms. Nash. He claimed that ever since Ms. Nash "took a warrant out" on the victim and Ms. Levi, the couple had been "trying to get back" at Ms. Nash and himself. He denied being involved in the victim's assault in any way. He told Detective Hayes that he was with his mother on the night of the assault.

Detective Hayes also testified that tape-recorded conversations taken from the jail between the Defendant and his sister and mother show the Defendant asking his family to provide him an alibi for the night of the assault. In the first recording, he told his mother that he had refused to talk to the detectives and for his mother to tell any police that he "was up there with you'uns" on the night of the assault. In a second recording, the Defendant repeatedly told his family members that he was home when the incident occurred. In a third recording, the Defendant reminded his sister once again that he was home with them when the assault occurred and instructed her to put his clothes "in the wash and wash them up real good" before handing anything over to the detectives. The Defendant also told his sister that he would use her and his mother as witnesses concerning his alibi before he would use Ms. Nash.

On cross-examination, Detective Hayes stated that neither Ms. Seals nor Mr. Kyle had been interviewed or arrested concerning these offenses. He described both individuals as "uncooperative." He explained that "two witnesses . . . say[ ] that [the Defendant] took a

-3-

large knife and cut my victim's chin and neck. The girl . . . only stood in the doorway. The black guy only chased him." Detective Hayes stated that he did not believe the Defendant's statement. He also disclosed for the first time that two and one-half hours after the assault, officers from the Morristown Police Department stopped Ms. Seals' vehicle; Mr. Kyle was with her, but the Defendant was not. He did not find the Defendant's absence from the vehicle significant because the stop occurred hours after the offense and within fifteen minutes of the Defendant's home. Detective Hayes said that the victim's false name and work papers did not affect the credibility of his account of the assault because, he explained, "I've dealt with Hispanics for several years now, and none of them has one name. . . . We're accustomed to it. . . . They're just here to work."

The defense presented the testimony of Mary Sipe, the Defendant's mother. Ms. Sipe testified that her daughter, Michelle Torres, had taken her to a doctor's appointment in Knoxville on November 2, and on their way home, they picked up the Defendant and Ms. Nash and took them to her home where they cooked chili and lasagna later that night. Ms. Sipe said that the Defendant never left their neighborhood that night although he was in and out of her house to visit Ms. Torres' nearby trailer. She testified that the Defendant and Ms. Nash could not drive. On cross-examination, Ms. Sipe contended that she would know if her son left at all that night, although she conceded that she did not see him at all times that evening.

The Defendant's sister, Michelle Torres, testified that she remembered November 2, 2007, very well because she and her brother "had a very heart-to-heart talk" concerning the care of their mother that night. She recalled that they cooked and watched movies that night. She said that she left her mother's home at around 2:00 or 3:00 in the morning when the Defendant told her he was going to bed. She claimed that the Defendant was not out of her sight for more than fifteen or twenty minutes the entire night.

The Defendant testified that he stayed at his mother's house on November 2 and 3 because his mother had been sick. He claimed that he never left the residence. The Defendant denied ever meeting the victim, but said that he just knew "of him." He denied knowing Mr. Kyle or riding in a vehicle with him. The Defendant testified that the victim and Ms. Levi were mad at him for kicking them out of Ms. Nash's home after the vandalism incident earlier that summer.

The Defendant did not object to Detective Hayes's testimony regarding the traffic stop, did not request a continuance, and did not make a contemporaneous request for mistrial. Following the presentation of the defense proof, the parties presented closing argument and the trial court instructed the jury. During jury deliberations, the Defendant made his first request for a mistrial based upon his allegation that the evidence concerning the traffic stop

was not provided during pretrial discovery and was exculpatory. The trial court denied the motion for mistrial, ruling that the evidence was not exculpatory and too remote from the time of the offense to have had any bearing on the outcome of the trial.

On appeal, the Defendant contends that the trial court erred in denying his motion for mistrial based upon the State's failure to provide evidence pretrial concerning the traffic stop. In addition, the Defendant contends that the State failed to disclose evidence that Mr. Kyle was arrested on a weapons charge during the traffic stop.[1] In his brief, the Defendant makes various conclusory arguments that this evidence was obviously exculpatory in light of the jury's verdict finding the Defendant guilty only of facilitation of aggravated assault. The State contends that the Defendant has waived this issue by failing to contemporaneously object when Detective Hayes disclosed the information concerning the traffic stop. The State also argues that the Defendant has failed to show any manifest necessity to merit granting a mistrial because he has failed to show that any Brady violation occurred. See Brady v. Maryland, 373 U.S. 83 (1963). Following our review, we agree with the State and affirm the judgments of the trial court.

*Analysis*

The purpose of declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App.1996). A mistrial is only appropriate when the trial cannot continue without causing a miscarriage of justice. See State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). For a mistrial to be declared, there must be a "manifest necessity." State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004). The decision to grant a mistrial is within the discretion of the trial court, and that decision will not be disturbed on appeal unless there was an abuse of discretion. State v. Reid, 91 S.W.3d 247 (Tenn. 2002). In reviewing for an abuse of discretion, this court has held that the following three factors should be considered: (1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof. State v. Welcome, 980 S.W.2d 215, 221 (Tenn. Crim. App. 2007).

As previously noted, the Defendant failed to object contemporaneously or to request a mistrial when Detective Hayes testified on cross-examination that Ms. Seals and Mr. Kyle

---

[1] Although this additional allegation is included in the motion for new trial, the transcript from the motion for new trial hearing is notably absent from the record. Accordingly, any proof concerning this allegedly undisclosed evidence is also absent from the record - along with the trial court's findings concerning this issue.

were involved in a traffic stop several hours after the incident in this case. Accordingly, we agree with the State that this issue is waived. Tenn. R. App. P. 36(a).

Furthermore, we note that the record before us refutes the Defendant's claim that any Brady violation occurred which would have required the trial court to grant a mistrial, had one been timely requested. Our supreme court summarized the four requirements necessary to establish a Brady violation in State v. Edgin, 902 S.W.2d 387 (Tenn. 1995):

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
2. The State must have suppressed the information;
3. The information must have been favorable to the accused; and
4. The information must have been material.

Edgin, 902 S.W.2d at 389 (citing State v. Evans, 838 S.W.2d 185 (Tenn. 1992); State v. Spurlock, 874 S.W.2d 602 (Tenn. Crim. App.1993); Workman v. State, 868 S.W.2d 705 (Tenn. Crim. App.1993); State v. Marshall, 845 S.W.2d 228 (Tenn. Crim. App.1992); Strouth v. State, 755 S.W.2d 819 (Tenn. Crim. App.1986)). It appears that the Defendant did make a general request for exculpatory information pretrial. However, the record before this court does not establish that the evidence concerning the traffic stop is favorable to the accused or material to the presentation of the Defendant's case. We agree with the trial court's finding that the traffic stop was too remote from the assault to make the Defendant's absence from the vehicle exculpatory. Additionally, the testimony of the victim and Ms. Levi clearly established that the Defendant cut the victim with a large knife while the other individuals played minor roles in the offense, if any. Yet the jury convicted the Defendant of the lesser included offense of facilitation of aggravated assault. Thus, we do not deem the evidence of the traffic stop to be material to this case. The Defendant failed to establish that a Brady violation occurred. Accordingly, the trial court correctly denied the Defendant's motion for mistrial.

CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-6-