IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 3, 2024 Session

## STATE OF TENNESSEE v. RASHARD FAIR

**Appeal from the Criminal Court for Shelby County
Nos. 18-03900, C1805602  Paula L. Skahan, Judge**

_____

### No. W2023-00234-CCA-R3-CD
_____

The Defendant, Rashard Fair, pled guilty in the Shelby County Criminal Court to voluntary manslaughter and received a three-year sentence to be served as one year in confinement followed by two years on probation. On appeal, the Defendant contends that the trial court erred by denying his requests for judicial diversion and full probation and that the trial court should have disqualified itself because the trial court's impartiality might reasonably be questioned. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court erred by failing to address fully on the record its reasons for denying judicial diversion and full probation. We also conclude that the trial court's statements during the sentencing hearing, particularly the trial court's comments about judicial diversion for the crime of voluntary manslaughter and the trial court's decision to increase the Defendant's sentence of confinement in response to defense counsel's request for bond pending appeal, call into question the trial court's impartiality in this case. Accordingly, we reverse and vacate the judgment of the trial court and remand the case for a new sentencing hearing, at which another judge shall preside, to determine the length and manner of service of the Defendant's sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed, Case Remanded**

JOHN W. CAMPBELL, SR. J., delivered the opinion of the court, in which J. ROSS DYER and MATTHEW J. WILSON, JJ., joined.

Jason Ballenger (on appeal and at trial) and Lorna S. McCluskey (at trial), Memphis, Tennessee, for the appellant, Rashard Fair.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Assistant Attorney General; Steve Mulroy, District Attorney General; and Tanisha Johnson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On May 26, 2017, the Defendant shot and killed the victim, Rodreiquous Lucas. In July 2018, the Shelby County Grand Jury indicted the Defendant for voluntary manslaughter and employing a firearm during the commission of a dangerous felony. On February 6, 2023, the Defendant pled guilty to voluntary manslaughter, a Class C felony. Pursuant to the plea agreement, the trial court was to conduct a sentencing hearing to determine the length of the sentence and whether the Defendant should be granted judicial diversion and full probation.

At the guilty plea hearing, the State gave the following factual account of the crime:

> Your Honor, had this matter proceeded to trial, the State's proof would've been that the victim, Rodreiquous Lucas as well as the defendant, Rashard Fair were both members of a motorcycle club. Your Honor, leading up to the events on May 26th, 2017 there was some dispute about the defendant leaving the motorcycle club. Upon leaving the club, he was supposed to return a center patch from the club. The victim in this case talked to the defendant about returning the patch. The defendant wanted his funds back for membership. However, he was informed that he could not receive those funds back.

> On the date of the incident, March 26th, 2017 the victim, along with two other males went to the defendant's home to retrieve the said patch. When they arrived -- Your Honor, there is video incident of the footage. You will see that there is a -- what appears to be a verbal dispute that leads to a verbal altercation between the victim and the defendant. That dispute does take place over a course of minutes. Your Honor will be able to see from the video that it -- it does seem to be heated based on the -- the body language of both individuals in the video.

> As the defendant turns to walk into his home, he is struck in the head by the victim in this case. He turns around and fires a shot. That shot struck -- strikes the victim . . . in the upper part of his chest. He bleeds out and is pronounced dead on the scene. Police arrive. They arrest Mr. Fair on the scene. He does give a statement of admission. Your Honor, these events did occur in Shelby County, Tennessee. We ask defense counsel to stipulate that this would've been the State's proof had this matter proceeded to trial.

- 2 -

Defense counsel stipulated to the facts presented by the State, and the trial court accepted the Defendant's guilty plea to voluntary manslaughter. In exchange for the Defendant's plea, the State dismissed the charge of employing a firearm during the commission of a dangerous felony and a charge for theft of property valued $1,000 or more in a separate case.

The trial court held a sentencing hearing on February 16, 2023. At the outset of the hearing, defense counsel advised the trial court that a presentence report was prepared "a while ago" and that the narrative in the report pertained to the theft charge that was dismissed. The trial court said it had a copy of the report, which was "four pages front and back." Defense counsel then passed to the trial court some documents favorable to the Defendant, including letters from his family and friends and a diploma showing he obtained his commercial driver's license ("CDL") from Delta Technical College. The documents were introduced into evidence as collective Exhibit A.

The Defendant testified that he lived in Memphis with his mother and that he was a high school graduate. He studied nursing at Southwest Tennessee Community College and the University of Memphis but was unable to complete a nursing program due to this case. After the Defendant was charged with the crimes, he obtained his CDL so he could drive trucks. He said he had been trying to work steadily in the freight business but that available work was "[u]p and down." Recently, the Defendant obtained full-time employment at an auto parts warehouse, packaging products and sorting parts. He made $16.50 per hour at the warehouse and continued to drive trucks when work was available.

The Defendant testified that he had two children, who were three and five years old. The Defendant had court-ordered joint custody of the five-year-old and a "loose agreement" for joint custody of the three-year-old. A formal custody hearing regarding the three-year-old was scheduled for April. The trial court asked, "What does this have to do with the hearing?" Defense counsel advised the trial court that the testimony related to the Defendant's family background, and the trial court responded, "Let's move it – move it along." The Defendant acknowledged that his presentence report showed he smoked marijuana. He said he no longer smoked marijuana and could pass a drug test.

The Defendant testified that he pled guilty to voluntary manslaughter because he shot the victim "[f]or a disagreement that I was trying to de-escalate the whole time." The trial court asked him to explain what happened without "a half-hour speech," and he stated as follows: The victim and the Defendant were members of a motorcycle club, but the Defendant decided to end his membership. The victim wanted the Defendant to return the Defendant's motorcycle patch, and the Defendant wanted the victim to return the Defendant's membership dues that the Defendant had paid in advance. The night before the shooting, the victim and the Defendant spoke on the telephone and came to an

agreement:  The victim would return part of the membership dues to the Defendant, and the Defendant would return the patch to the victim.  The next day, the victim and four men "showed up" at the Defendant's house.

The trial court began questioning the Defendant.  The Defendant testified that he and the victim talked at the back door while the four men pretended to work on a motorcycle in his yard.  The victim did not want to return the Defendant's dues as they had agreed and tried to "strongarm" the Defendant.  The trial court asked what the Defendant meant by "strongarm," and he answered, "Basically, he didn't want to give me the tail end of my dues. . . . I had paid up for the year; paid up my motorcycle dues for the year."  The victim "wanted his patch back," but the Defendant said no.  They continued to argue until the Defendant finally told the victim, "[Y]ou know what?  Forget it.  I'm just going to give you your patch.  Just get the hell out of my yard."  The patch was inside the Defendant's home and was close to the back door, so the Defendant turned around and stepped inside to get the patch.  While he had his back to the victim, the victim hit the left side of his head one time.  The Defendant turned around and "end[ed] up shooting him."  The trial court asked if the Defendant was inside his house when the victim hit him and if the victim hit him from behind.  The Defendant answered both questions in the affirmative.

At that point, defense counsel advised the trial court that the State had a video of the shooting.  The trial court asked the State, "Was he inside the house?"  The State responded, "Judge, he was walking into the door of the home, yes.  He was passing through his home. . . . He gets struck in the back and he turns around and shoots him. . . . [T]hat's what the video shows, Your Honor."

Defense counsel resumed questioning the Defendant.  The Defendant testified that he fired one shot at the victim, that he stayed on the scene, and that he talked with the police when they arrived.  Sometime prior to this incident, the Defendant was in an automobile accident in which he was "T-boned" by an intoxicated driver.  The accident caused the left side of his head to go through the driver's side window of his car.  The Defendant suffered a concussion and had surgeries on the left side of his face.  When the victim hit the left side of the Defendant's head, the Defendant was reminded of the car accident and thought about "dying."  The Defendant said he was "[v]ery remorseful" for killing the victim "for the simple fact some kids going without their pops and that's messed up."

On cross-examination, the Defendant testified that he had been a member of the motorcycle club for one year.  He was supposed to pay his membership dues monthly but decided to pay the entire year in advance.  He acknowledged that the club had rules but denied that the rules said membership dues were nonrefundable.  The Defendant said he did not want the victim to return all of his money, just part of his money.  The four men who came to the Defendant's house with the victim also were club members, and they had

guns.  The Defendant acknowledged that the victim "punched" him as he was walking into his house and that he turned around and shot the victim.  He said he thought he should receive judicial diversion because he had "stayed out of trouble" and had done "everything [he] was supposed to do."

At the conclusion of the Defendant's testimony, the trial court, reading from the presentence report, asked, "What is this thing regarding this stolen motorcycle the year before?"  Defense counsel advised the trial court that a stolen motorcycle was found in the possession of a man who claimed to have obtained the motorcycle from the Defendant but that the Defendant never possessed the motorcycle.  The trial court stated, "I didn't ask you, I asked him."  The Defendant told the trial court that the man who stole the motorcycle blamed him for the theft.  The trial court read aloud the narrative about the theft that was in the presentence report.  When the trial court finished, the Defendant told the trial court that he did not steal the motorcycle.  The trial court responded, "Of course you didn't."  The Defendant told the trial court that the man accused him of stealing the motorcycle because the man "wanted the female I was dealing with at the time."  The trial court asked the Defendant why he had a gun on the day of the shooting, and the Defendant answered, "Every time I step outside, my gun was always on my hip."  The following exchange then occurred:

> THE COURT:  I wish you'd never had that gun on your hip all -- all the time.  I'm sure the victim's family feels the same way.  You wouldn't be sitting here, and he'd be with them.  Gun always on your hip.  You think you're a cowboy?  Going to ride a motorcycle, have a gun on your hip.
>
> That's why half the cases we've got in Memphis, people being shot and killed.  Got to have a gun in case someone disrespects me.  Can't have a fight.  Can't have a man-to-man fight.  By God, someone hits me, they're getting shot and killed.  I'm so sick of it.  I'll take care of them; right?  That's the way you handle things.
>
> THE WITNESS:  No, ma'am.  That's not –
>
> THE COURT:  It's exactly what you did.  It's exactly what you did; right?  Tell me something different.
>
> THE WITNESS:  That's just what happened that day.
>
> THE COURT:  Exactly.  What you did.
>
> THE WITNESS:  Okay.

THE COURT:  Okay?

THE WITNESS:  I'm not fixing to argue.

THE COURT:  Tell me something different.  You were just trying to de-escalate the situation.

THE WITNESS:  Yes, ma'am.  Because for the --

THE COURT:  You escalated it.

THE WITNESS:  -- simple fact I did not want nobody to get hurt.  Just because I had a gun on me does not mean I want to use it.

THE COURT:  But you did.

THE WITNESS:  End up using it in self-defense.

THE COURT:  Instead of turning around and punching him, you shot and killed him.  It's why we're here today.  Couldn't have a fistfight.  You did not de-escalate.  I'm tired of all these guns.

Margarit Lucas, the victim's mother, testified for the State that the Defendant should serve time in confinement because the shooting was "a senseless killing about a motorcycle patch."  She said that the victim was a large man but that he "had the heart of a real angel."  One week before the shooting, the victim was at Ms. Lucas's home when he received a telephone call about the Defendant, who had "broken down."  The victim stopped what he was doing and left Ms. Lucas's home to help the Defendant.  The victim had a thirteen-year-old son, and Ms. Lucas described the victim as a "gentle giant."  She said that he had just been assigned to be the youth minister at her church when he was killed and that he was "always trying to teach children how to do the right thing."

Andrea Brooks, the victim's first cousin, testified that the victim graduated from high school, received a scholarship to play basketball in college, and wanted a career in law enforcement.  However, his father had multiple strokes, so he returned home to help his parents.  The victim also helped Ms. Brooks's mother, who had kidney failure, prior to her death and would take her to the hospital.  Ms. Brooks said that the victim was the "backbone" of their family and that he assisted his family members whenever they called him.  She described him as "big and tall" but "a protector."  Ms. Brooks's father was one of the founders of the motorcycle club, and the victim eventually became the club president.  She said that she attended club events and that the club had rules.

During closing arguments, defense counsel asserted that although the victim lost his life, the victim "attacked" the Defendant inside the Defendant's home. The trial court disagreed with defense counsel, stating, "He wasn't in his home." The trial court stated that it had not seen the video but that "from what I understand there's an argument. He won't give the patch back and there's an argument and he's like, whatever, and goes to walk away, goes to get into his home. He's hit from behind, turns around, takes his gun, and shoots the man dead." Defense counsel continued to assert that the Defendant was in his home when the victim struck him. Defense counsel offered to play the video, but the trial court turned to the State for an explanation as to whether the Defendant was inside his home. The State said it was not disputing that the Defendant "was walking into his home" and "had crossed the threshold" when "[the victim's] fist did cross the threshold to hit [the Defendant] in the head." The State added, though, that the victim "never went into the home." The trial court reiterated, "[T]he victim did not go inside the home."

After the parties' closing arguments, the trial court stated:

> I personally find [the Defendant's] attitude as it was when he entered the guilty plea to be very cavalier towards this whole thing, to be expecting diversion or probation. And I've been offended by his whole attitude on the stand. Just shocking for a voluntary manslaughter conviction in this situation.

> I had to pull out of him to get what actually happened regarding this patch. You know, I -- I really couldn't understand other than him saying I was just trying to de-escalate and the other guy's trying to, you know, fight and all this. I was just trying to de-escalate and say it's over and just walk away, and that's really not what happened. These guys got into what sounds like a very serious argument and with [the Defendant] wanting me to believe that he was going to get that patch. And I don't think that was his intention, but, you know, we'll never know exactly because [the victim] is dead.

Turning to sentencing considerations, the trial court first addressed the Defendant's amenability to correction and stated that the Defendant "can probably stay out of trouble if I were to place him on diversion or probation. I mean, hopefully he's learned not to have a gun on his hip 24/7 now after this horrible incident." Next, the trial court addressed the circumstances of the offense:

> Circumstances of the offense are just horrible. It's a voluntary manslaughter. It's -- you know, there's been talk with the legislature over the past several years about raising the sentence for this type of crime where it's not a three-to six-year sentence, where it's much higher. And I'm

certainly in favor of that type of sentence. Because first of all, allowing someone to go on diversion for voluntary manslaughter, I am totally in disagreement with that. And if someone doesn't go on diversion or probation, that it's only a three-to-six-year sentence, I think is shocking.

But circumstances here in this offense is that we have an argument. It gets out of control. I -- I don't know if the video contains the language that was used, what was said, what set [the victim] off to want to hit [the Defendant]. But I'm sure it was something to the effect of you're not getting that patch back and had [the victim] lose his cool, going after [the Defendant]. And [the Defendant], instead of responding -- well, responding with the gunshot.

Just -- it is voluntary manslaughter, but I -- I'm sure the gun was probably not within the view of [the victim] and I just -- I think this is especially aggravated as far as voluntary manslaughter goes, so I -- I do find that to be -- to give great weight to circumstances of the offense.

The trial court then stated that the Defendant did not have a criminal record but noted that he was on bond for the theft charge when the shooting occurred. Regarding the Defendant's social history, the trial court said that "this presentence report is pretty scant" but that the report showed the Defendant was unemployed when the report was prepared "four or five years ago." The trial court noted that the presentence report said that the Defendant's family relations were "good," that he was single with one child, and that he resided with his mother. The trial court concluded that the Defendant's social history was "decent." The trial court stated that the Defendant's physical and mental health "appear to be okay. He doesn't report any issues."

Thereafter, the trial court addressed whether judicial diversion will serve the interests of the public as well as the accused and said, "Certainly will serve his interests. I don't really think it will serve the interests of the public." The trial court then immediately stated, "Weighing all these factors and considering the victim impact information also and how devastated the victim's family members are because of this act, diversion is denied." Defense counsel advised the trial court that he did not play the video of the shooting out of respect for the victim's family members but again offered to play the video because "you're making a lot of assumptions about what's on that video." The trial court responded that it was not making assumptions and that "I've made my decision. You could've played it; you didn't. . . . The proof is closed. The proof is closed."

The trial court found that the Defendant was a Range I, standard offender with a range of punishment of three to six years and asked if defense counsel "want[ed] to be

heard on that." Defense counsel asserted that the Defendant would be a convicted felon for the rest of his life and that sentencing him to confinement "does nothing for anybody." The trial court responded, "Oh, it'll do something for the victim's family." When defense counsel continued to argue against confinement, the trial court interrupted counsel and stated, "I just asked you where you wanted me to sentence him in the range of three to six years." Defense counsel answered, "Your Honor, I would ask for three years."

The following exchange then occurred:

THE COURT: All right. Thank you.

I think split confinement is appropriate in this sentence. Let me see the -- oh, I have it. [The Defendant] served approximately one week back in 2017 on this case. What I'm going to do is sentence [the Defendant] to three years as a range one offender, 30 percent service of sentence. He's to go into custody today for six months.

[Defense counsel]: Your Honor, can you give him at least some time to get --

THE COURT: No, I can't.

[Defense counsel]: -- his affairs in order, Your Honor?

THE COURT: I'm sorry.

[Defense counsel]: He is an ideal candidate for probation, Your Honor, and you're taking him into custody for a half a year? He's -- he's got to get some affairs in order, Your Honor. There's no reason for him to be denied probation at this point, so how was he supposed to be prepared to be -- to be going into custody today?

THE COURT: That's not really --

[Defense counsel]: Also, Your Honor --

THE COURT: -- it's not really my issue.

[Defense counsel]: -- I believe we will probably be appealing this decision --

- 9 -

THE COURT: Go ahead.

[Defense counsel]: -- so we'll be needing to ask for -- for you to, I believe it's -- he's entitled to remain out on bond if the sentence is less than one year in jail.

THE COURT: Okay. One year jail time. Three years. Go into custody today one year, two years probation following that.

[Defense counsel]: Your Honor --

THE COURT: Conditions of --

[Defense counsel]: -- is it just because I mentioned that he's --

THE COURT: Sit down.

[Defense counsel]: -- going to appeal, you

THE COURT: Sit down.

[Defense counsel]: You're sentencing him to a year in jail because --

THE COURT: Sit down then.

[Defense counsel]: -- I mentioned that he might want to appeal, Your Honor.

THE COURT: You keep talking, [defense counsel], it's going to keep getting worse.

[Defense counsel]: It's not him, it's me, Your Honor. You're sentencing --

THE COURT: That's right. Sit down. Maintain gainful employment, monthly drug screens. He's to be released February 16, 2024.

[Defense counsel]: Your Honor, if we get the transcript of this --

THE COURT: Sure can.

[Defense counsel]: -- ordered. As well as, Your Honor, I would like to ask you to -- to set a bond for [the Defendant] while he remains out, for him to be able to -- to stay out on bond while we appeal this matter. With the fact that appeals do take some time, he -- he would be possibly finishing that one-year sentence before he's even -- before a decision is made. So I would ask Your Honor to set a bond for [the Defendant] during pendency of an appeal.

THE COURT: What was his bond on this?

THE CLERK: 25,000.

THE COURT: That's all? All right. We'll set it at 75,000. All right. Write up the paperwork.

## ANALYSIS

### I. Judicial Diversion and Probation

The Defendant contends that the trial court abused its discretion by denying his requests for judicial diversion and full probation without adequately stating on the record its reasons for doing so. The State argues that the trial court did not abuse its discretion by denying judicial diversion but acknowledges that the trial court did not make the requisite findings to deny full probation. We conclude that the trial court erred by failing to address fully on the record its reasons for denying judicial diversion and full probation.

This court reviews the length, range, and manner of service imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012); *State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012) (applying the standard to alternative sentencing). In determining a defendant's sentence, the trial court is to consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the mitigating and enhancement factors, (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, (7) any statement by the Defendant in his own behalf about sentencing, and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* Tenn. Code Ann. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98.

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." *Bise*, 380 S.W.3d at 706. Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id*. at 707. This same standard of review applies to the decision to grant or deny judicial diversion. *State v. King*, 432 S.W.3d 316, 324-25 (Tenn. 2014).

Pursuant to Tennessee Code Annotated section 40-35-313(a)(1)(B)(i)(a)-(e), a defendant is eligible for judicial diversion when he or she is found guilty or pleads guilty or nolo contendere to a Class C, D, or E felony; is not seeking deferral for an offense committed by an elected official; is not seeking deferral for a sexual offense; has not been convicted of a felony or a Class A misdemeanor previously and served a sentence of confinement; and has not been granted judicial diversion or pretrial diversion previously. Additionally, in determining whether to grant diversion, the trial court must consider the following factors: (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused. *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996).

A trial court should not deny judicial diversion without explaining the factors in support of its denial and how those factors outweigh other factors in favor of diversion. *King*, 432 S.W.3d at 326; *Electroplating*, 990 S.W.2d at 229. When the trial court considers the factors, "specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion," then this court will "apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." *King*, 432 S.W.3d at 327. A trial court's failure to consider the factors results in a loss of the presumption of reasonableness, and this court will either conduct a de novo review or remand the case to the trial court for reconsideration. *Id*. at 327-28.

Regarding probation, a defendant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. *See* Tenn. Code Ann. § 40-35-303(a). The Defendant's sentence meets this requirement. Moreover, a defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. *See Id.* §

40-35-102(6). In the instant case, the Defendant is considered to be a favorable candidate for alternative sentencing because he is a standard offender.

The following sentencing considerations in Tennessee Code Annotated section 40-35-103(1) should be used to determine whether alternative sentencing is appropriate:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Additionally, a court should consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. *See Id.* § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. *Id.* § 40-35-102(5).

The burden is on the defendant to demonstrate suitability for full probation. *State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017). In evaluating the suitability of probation, the trial court should consider the same factors applicable to diversion: "(1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) special and general deterrence value." *Id.* Before a trial court can deny probation based solely on the basis of the offense, "the circumstances of the offense as *particularly committed in the case under consideration* must demonstrate that the defendant committed the offense in some manner more egregious than is contemplated simply by the elements of the offense." *Id.* at 292-93 (emphasis in original).

As to the Defendant's request for judicial diversion, the trial court found that the Defendant's amenability to correction, his lack of a criminal record, his social history, his physical and mental health, and whether judicial diversion will serve the interests of the Defendant weighed in favor of granting diversion but that the circumstances of the offense and whether judicial diversion will serve the interests of the public weighed against granting diversion. The trial court gave great weight to the circumstances of the offense. The trial court stated that weighing "these" factors warranted denying diversion, but the

trial court did not address the deterrence value to the accused as well as others or explain why the factors against diversion outweighed the factors in favor of diversion.

The State argues that the trial court implicitly addressed the deterrence factor during the Defendant's testimony when the trial court stated that it was "sick of" people carrying guns and shooting people for being disrespected or hit. The trial court stated, "I'm sick of all these guns." However, the trial court did not mention deterrence when it made those statements and did not refer back to those statement when it addressed judicial diversion.

Regarding the Defendant's request for full probation, the trial court only addressed the first factor, amenability to correction, stating that the Defendant "can probably stay out of trouble if I were to place him on diversion or probation." The trial court did not address the remaining five factors or any of the considerations in Tennessee Code Annotated section 40-35-103(1).

When a trial court fails to consider and weigh the relevant factors, the presumption of reasonableness does not apply, and this court may either conduct a de novo review or remand the case for reconsideration. *King*, 432 S.W.3d at 327-28. Here, the trial court referred to the presentence report and read from the report during the sentencing hearing. However, the presentence report is not listed as a sentencing hearing exhibit, and it appears that neither party formally introduced the report into evidence. We note that the presentence report already was four to five years old at the time of the sentencing hearing and may not have included a validated risk and needs assessment, which the trial court was supposed to consider but did not mention. In any event, without the presentence report in the appellate record, we are unable to conduct a de novo review and must remand the case for resentencing.

## II. Recusal

The Defendant contends that the trial court should have recused itself because the trial court's impartiality might reasonably be questioned in light of the court's comments about judicial diversion for the crime of voluntary manslaughter and the court's increasing the Defendant's sentence of confinement when defense counsel requested bond pending appeal. The State argues that recusal was not required because the trial court's comments did not show that the court was unable to remain impartial. We agree with the Defendant that the trial court's comments during the hearing call into question the trial court's impartiality in this case.

"[A]ll litigants have a right to have their cases heard by fair and impartial judges." *Kinard v. Kinard*, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998). "A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, [and] lawyers" and must perform his or her judicial duties without bias or prejudice. Tenn. Sup. Ct. R. 10, RJCs 2.3(A) &

2.8(A). In reviewing a claim of judicial bias, "[a]ny comments made by the trial court must be construed in the context of all the facts and circumstances to determine whether a reasonable person would construe those remarks as indicating partiality on the merits of the case." *Alley v. State*, 882 S.W.2d 810, 822 (Tenn. Crim. App. 1994). Adverse rulings usually are insufficient to establish bias. *Id*. at 821. The "issue to be determined is not the propriety of the judicial conduct of the trial judge, but whether [the judge] committed an error which resulted in an unjust disposition of the case." *State v. Hurley*, 876 S.W.2d 57, 64 (Tenn. 1993).

The State indicted the Defendant for voluntary manslaughter, and the Defendant pled guilty to that offense. "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). At the time of the crime, voluntary manslaughter was a Class C felony.[1] *Id*. § 39-13-211(b) (2014). Therefore, the Defendant was eligible to be considered for judicial diversion.[2]

The trial court did address factors for judicial diversion. In considering the circumstances of the offense, though, the trial court commented that it was "totally in disagreement" with a defendant receiving judicial diversion for voluntary manslaughter and that even a three- to six-year sentence of confinement for the offense was "shocking." As this court has stated, "Death is always permanent in a homicide case and cannot be considered as a factor for denying diversion under Tennessee Code Annotated section 40-35-313." *State v. Spang*, No. M2014-00468-CCA-R3-CD, 2015 WL 510921, at *4 (Tenn. Crim. App. Feb. 6, 2015); *see State v. Markham*, 755 S.W.2d 850, 853 (Tenn. Crim. App. 1988) ("Denial of diversion based only on the essential elements of a crime, without judicially weighing all relevant factors, effectively excludes persons charged with that crime from consideration for pretrial diversion. Only the legislature has that prerogative."). "However, the circumstance leading to death can be considered." *Spang*, 2015 WL 510921, at *4.

The State and the Defendant stipulated at the guilty plea hearing that the victim and the Defendant got into a "heated" argument, that the Defendant turned to walk into his home, and that the victim struck the Defendant's head. At sentencing, the State did not dispute that the Defendant had entered his home when the victim reached his fist into the doorway and struck the Defendant. The Defendant testified that the men with the victim

---

[1] Effective July 1, 2023, voluntary manslaughter is a Class B felony. *See* Tenn. Code Ann. § 39-13-211(b) (Supp. 2023).

[2] We note that defense counsel referred to "a clean TBI report" during the sentencing hearing but that the record does not contain the Defendant's application for judicial diversion or the certificate of eligibility for judicial diversion issued by the Tennessee Bureau of Investigation. The State does not dispute that the Defendant is eligible for judicial diversion.

were all armed. Yet, the trial court found that the circumstances leading to the victim's death were especially aggravated based on the trial court's speculation that the Defendant must have said something to cause the victim to "lose his cool" and want to hit the Defendant. The trial court also speculated that the Defendant's gun was not in the victim's view. However, the trial court did not consider that the victim, whom the State's own witnesses described as a very large man, went to the Defendant's home accompanied by either two or four men, depending on whether one accepts the State's statement of fact or the Defendant's testimony, and that the victim struck the Defendant's head when the Defendant had his back to the victim, was walking away from the victim, and had entered his home. In fact, the trial court refused to accept that the Defendant was inside his residence when the victim breached the doorway and punched him even though the State twice told the trial court that the Defendant was in his home when he was struck.

Of additional concern, a video of the shooting existed, but the trial court chose to speculate about what was depicted in the video rather than watch the video. It is perplexing to this court that neither the State nor the Defendant played the video or introduced the video into evidence. It is even more perplexing that defense counsel offered to play the video but that the trial court instead relied on the State's interpretation of the video to determine whether the Defendant was inside or outside his home when the victim hit him. The trial court's refusal to watch the video suggests that the trial court had decided it was not going to consider any proof that would undermine its decision not to grant judicial diversion to the Defendant.

Even more troubling is what occurred during the trial court's final exchange with defense counsel. The trial court initially ordered that the Defendant serve six months of his three-year sentence in confinement. The trial court inexplicably increased his confinement to one year when defense counsel stated he would be appealing the case and requested bond pending appeal. The trial court then threatened an even lengthier period of incarceration if defense counsel did not stop talking.

In *Cook v. State*, 606 S.W.3d 247, 253 (Tenn. 2020), which the Defendant cites in his brief, our supreme court considered whether a post-conviction court's comments during a post-conviction evidentiary hearing established that the judge should have recused himself, even when the petitioner had not requested recusal, because the judge's impartiality might reasonably be questioned. During the evidentiary hearing, the post-conviction court commented about his professional familiarity with the petitioner's trial attorneys. Directly quoting the post-conviction court's comments, our supreme court recalled that the post-conviction court referred to the trial attorneys as "'[t]wo of the most preeminent lawyers' in the country and in the world"; described the petitioner's claims against his trial attorneys as "'almost absolutely laughable'"; made disparaging remarks about the petitioner's appointed post-conviction counsel, Tennessee's post-conviction

procedures, and petitioners and their attorneys in general; referred to post-conviction claims in Tennessee as a "'game'"; and commented about his preference for the post-conviction law of Texas, where he had practiced for eight years. *Cook*, 606 S.W.3d at 255-256. Reviewing the issue de novo, our supreme court concluded that Rule of Judicial Conduct 2.11(A), which requires that "'[a] judge *shall* disqualify himself or herself in *any* proceeding in which the judge's partiality might reasonably be questioned,'" obligated the post-conviction judge to recuse himself. *Id*. at 255 (quoting Tenn. Sup. Ct. R. 10, RJC 2.11(A)) (emphasis in original). As our supreme court explained,

> Rule of Judicial Conduct 2.11 recognizes that "the appearance of bias is as injurious to the integrity of the judicial system as actual bias." [*Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 565 (Tenn. 2001)] (citing *Alley*, 882 at 820). As a result, Rule of Judicial Conduct 2.11 incorporates the objective standard Tennessee judges have long used to evaluate recusal motions. *In re Hooker*, 340 S.W.3d 389, 395 (Tenn. 2011) (citing *State v. Cannon*, 254 S.W.3d 287, 307 (Tenn. 2008); *Liberty Mut. Ins. Co.*, 38 S.W.3d at 564-65). Under this objective test, recusal is required if "'a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" *Liberty Mut. Ins. Co.*, 38 S.W.3d at 564-65 (quoting *Alley*, 882 S.W.2d at 820). Rule of Judicial Conduct 2.11 and the objective standard it embraces reflect that
>
>> our system of law has always endeavored to prevent even the probability of unfairness. . . . Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice."
>
> *In re Murchison*, 349 U.S. 133, 136 (1955) (quoting [*Offutt v. United States*, 348 U.S. 11, 14 (1954)]).

*Id*.

The State asserts that the trial court's comments at the conclusion of the hearing were just part of a "testy" and "tense" exchange between the trial court and defense counsel in the course of litigation. We disagree. Granted, a trial court has broad discretion in controlling the course and conduct of a trial. *State v. Cazes*, 875 S.W.2d 253, 260 (Tenn. 1994). Furthermore, as noted by the State, "[a] judge's irritation or exasperation with counsel, criticism of counsel for perceived delays or failures to follow rules, friction

- 17 -

occurring during litigation, or even sanctions and contempt charges do not establish the objective personal bias that would prevent a fair assessment of the merits of the case." *McKenzie v. McKenzie*, No. M2014-00010-COA-T10B-CV, 2014 WL 575908, at *5 (Tenn. Ct. App. Feb. 11, 2014); *see Strouth v. State*, 755 S.W.2d 819, 823 (Tenn. Crim. App. 1986) (statements by a trial court that could have been interpreted as "impatient or rude" and appeared to have been "expressions of exasperation rather than prejudice" did not demonstrate bias and warrant recusal). Nevertheless, "a judge's bias against an attorney, based upon occurrences during litigation, may warrant disqualification . . . where hostility or bias is so pervasive that it is sufficient to deny the litigant a fair trial." *McKenzie*, 2014 WL 575908, at *5.

In this case, defense counsel should have sat down when the trial court directed him to do so. That said, we can appreciate defense counsel's concern when the trial court suddenly increased the Defendant's sentence from six months to one year after defense counsel asked for bond pending appeal. The trial court raised the Defendant's sentence for no other reason but to punish him for defense counsel's actions. While the trial court's comments during the sentencing hearing may not have been quite as extensive or egregious as the post-conviction court's comments in *Cook*, they still create more than a reasonable basis for this court to question the trial court's impartiality in this case. Accordingly, we conclude that the trial court's sentencing determinations must be reversed and that the case be remanded to the trial court for a new sentencing hearing with a different trial judge.

## CONCLUSION

Based upon the oral arguments, the record, and the parties' briefs, the judgment of the trial court is reversed and vacated, and the case is remanded to the trial court for a new sentencing hearing in which a different judge shall preside.

_____
JOHN W. CAMPBELL, SR., JUDGE