IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 22, 2024 Session

**LANORA HENRY v. JEFFERY W. HENRY**

**Appeal from the Chancery Court for Montgomery County**
**No. DI-23-70    Ben Dean, Chancellor**
_____

**No. M2024-00030-COA-R3-CV**
_____

Husband and wife divorced.  In dividing the parties' marital assets, the trial court granted Husband significantly less equity than Wife in the parties' marital residence.  In its oral ruling, the trial court also set a five-year horizon before Wife needed to sell or refinance the home.  On appeal, Husband challenges both the amount of the equity in the home that he was awarded and the failure to order a quicker sale or refinancing by Wife of the marital residence.  Both parties agree the trial court inadvertently failed to memorialize in its written final order a sale or refinancing requirement for the end of this five-year horizon.  We remand to the trial court for modification of its order in accordance with the parties' agreed understanding; otherwise, we affirm the trial court's order.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Remanded for Modification**

JEFFREY USMAN, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Karla C. Miller, Nashville, Tennessee, for the appellant, Jeffery W. Henry.

Stacy A. Turner, Clarksville, Tennessee, for the appellee, Lanora Henry.

**OPINION**

I.

Jeffery Henry (Husband) and Lanora Henry (Wife) married in 1983.  In 2017, the couple moved to Clarksville, Tennessee, and purchased a house.  The parties' daughter was living in Chicago, Illinois.  Evidently, the original plan was for the parties' daughter and

her three children, Husband and Wife's grandchildren, all to relocate to live in Clarksville. There is evidence in the record that suggests that Husband and Wife purchased the Clarksville house, which has five bedrooms, with this living arrangement in mind. Husband took out a loan through the Department of Veterans Affairs to finance a downpayment and a mortgage to finance the remainder of the purchase price.

Their daughter did not, however, relocate to Clarksville. Due to concerns about safety of the grandchildren, however, all three of the daughter's children came to live with Husband and Wife in Clarksville. Wife has legal custody of the oldest child and physical custody of all three grandchildren.

In 2023, Husband and Wife began divorce proceedings. Prior to trial, the parties participated in mediation and settled multiple issues. They agreed to an appraiser to assess the value of their marital residence during this mediation. According to the appraiser, the house was worth $440,000 in 2023. The equity in the home was $217,346.60.

At trial, Husband and Wife disagreed about what should happen to the house. During an opening statement at trial, Wife's counsel indicated that Wife was "asking to sell" the house, but Wife later changed course, telling the trial court, "I need that house so bad. I've been looking at the market, and I can afford what he pays for it." Wife also informed the trial court that she intends to continue caring for the three grandchildren, and that the house would be instrumental in being able to keep the grandchildren's current circumstances intact. By contrast, Husband originally insisted that he be permitted to keep the house and that Wife should receive no interest in it. During trial, Husband indicated as an alternative a willingness to buy out Wife's equity share in the home.

At the end of the hearing, the trial court granted the parties' divorce and addressed property distribution and spousal support. The trial court offered an extensive oral ruling. During these remarks, the trial court made comments that Husband believes are indicative of bias against him. Given the centrality to Husband's appeal of the trial court's comments during its oral ruling, we quote extensively to provide context, and we bold and italicize the specific statements that Husband identifies as objectionable:

[Trial Court]: [L]ooking at dissipation [of the marital estate] . . . we'll get to the Mercedes. The high-dollar Mercedes. Man, I bet you – I wouldn't doubt, I bet when you got that [car], man, I would have been proud to have that car. That is a – I don't know if it's top of the line, but it sure does look like it.

But you bought that for you and your family. And that was what you said. And you tried – I heard testimony, it changed a little bit. At one point you said, well, when times got tough then I gave [the car] back to my mother and I told her . . . I wouldn't worry about paying her back [the loan she gave to purchase the Mercedes].

Then . . . later on when you were asked you changed your testimony and you made it sound like [that conversation] happened earlier in time.

And the Court doesn't find, quite frankly, that your story about, well, I gifted this [Mercedes] to my mother, you know, a day or two after the divorce but before you got served and somehow that was some legitimate gift to her or some financial pressure caused you to do that.

I haven't gotten anything any writing. I hadn't gotten a cancelled check. I hadn't heard from your mama.

And, you know, this is like any loan from a parent. I haven't seen one in this court, yet, that a kid paid back. So if she gave you [$20,000] . . . I didn't hear you say you made a payment. I bet you she gave you that [$20,000], is what she did, because she loves you.

But anyways, the Court doesn't find that version of that theory to be credible. The Court finds that the 2015 Mercedes is marital property.

And, sir, I'm going to let you keep that. You're going to get to do what you want with [the Mercedes].

You know, if I was . . . as rough as you want to be on her, I'd probably ought to give it to her. But she's smart enough, she don't want the thing.

***But anyways, you better be glad I've got justice that I'm going to do today. You're going to get what you deserve, sir. I'm not going to be stingy to you like you want to be to her.***

. . . .

Sir, do you want to give her the 2017 Buick LaCrosse with 157,000 miles, or do you want to make a payment on getting her a new one? Which one do you want sir?

You tell me. Do you want me to add to what you're going to have on your plate, or do you want to let her keep the high-mile car? I'm going to let you decide.

[Husband]: She can have it.

[Trial Court:] Okay. See. Now we're talking sense.

- 3 -

She's going to get to keep [it] – *sir, you've been married to this woman for 40 years and you want to put her out like a dog in a 2000 Mercedes.[1]* Lord knows what kind of problems that car has got.

Forty years of marriage. This is the way you going to treat 40 years of marriage.

*I'll tell you what, if I was as rough to you today as you want me to be to her, you'd leave out of here with nothing.*

So she's going to get the car with the high miles because she needs something to get around in. . . . She's getting that car. She valued it at [$]15,000. It ain't worth [$]15,000. A car with that many miles. The Court finds it's worth $10,000. It's probably not worth that. . . . She's getting that car.

. . . .

[Statutory factor] Number (9) is the standard of living of the parties established during the marriage.

And as I've said, you guys haven't lived extravagantly. But you-all . . . appear to have a very nice house. I mean, you-all bought the Mercedes car. I know one of them is older. But you-all got the newer one.

. . . [Y]ou got a good job, sir. You know, as it relates to cars, you're getting mileage [paid for by your employer]. I mean, you can go . . . drive a whole lot more than me. I could go get me a nice car payment for what my mileage check is. I bet you could get you a Mercedes with your miles check if you're putting that kind of miles on a car.

But anyways, you-all had an upper middle-class lifestyle. I can tell that. You-all have enjoyed the finer things in life to the detriment of you-all's retirement accounts.

You know, largely in what the Court's doing today – *now, sir, in your proposal you'd have her, as I said, put out in the street like a dog.* She deserves much better than that.

Quite frankly, . . . as I said, if I gave you the justice that you came and

---

[1] The marital estate included three vehicles two of which were Mercedes.

asked me for, ***you'd leave out of here, and, man . . . it'd be a whole lot worse than it's going to be today on you.***

You know, and as I said, the standard of living with what I'm going to do today, she's not going to be living rich. She's . . . still going to need the help of her daughter. She's still going to have to work. She's not going to be able to retire at 62. She's not going to be retired at 65. That's the reality.

I certainly don't see her being retired any sooner than you do, [Husband].

So the Court makes those notes about the standard of living.

. . . .

[Statutory factor] Number (11) will be the relative fault of the parties.

And this is something, you know, the Court gets to consider. You know, this is often the way, you know. If [Wife] had run out and left you for another man, which I hadn't heard anything about her having another man. So if she had, she's done a good job of keeping it quiet.

But otherwise, this would be where somebody has run off with somebody else. And, you know, I wouldn't make you pay her. Why should she get alimony and all this [if] she chose to run off and be a bad wife[?]

And the Court's heard her testimony about her unhappiness during the marriage. And, you know, there's some . . . measure of unhappiness and displeasure in every marriage. If you think somebody's got a perfect marriage, you don't know them well enough.

And I'm sure I've heard the bad. When you set out, I bet you there was a whole lot of love and whole lot of good in it, too. I know that's gotten [lost] in this process.

But I'm not going to use fault in this case to make this any worse on either of you as far as her getting more money or you paying more.

***I'm a little bit perturbed, sir***, just, you know, with what you proposed for me to do for her, that you'd do that to her. You know. ***The screwing you would have had me to give her, if I gave that to you, . . . I couldn't do that to you.***

- 5 -

*And here you are, 40 years of marriage, you want to do this to her. It, quite frankly, shocks the Court.*

*But I'm not going to use . . . that and punish you like you wanted to do [to her] and make her suffer like what I've heard today in your proposal for her.*

During these remarks, the trial court informed Husband that it decided to award Wife the marital residence, stating,

The Court's going to award [Wife] the marital residence with some stipulations to that.

She's going to be paying the monthly mortgage payment. I'm going to be addressing the alimony next. And that's going to have some play in that.

But I'm going to give her this house. She's going to be able to keep that until she reaches the age of 64 and a half. So six months after her 64th birthday. At that time she's either going to refinance the house, or she's going to sell the house, and she's going to pay him.

. . .

Given [Husband's] earning capacity, his ability to go out and get another house, his ability to acquire future assets, and in light of all these things that I went over, the assets that each of them are getting, the $48,000 each of them is going to have in a retirement account, the Court thinks that it would be appropriate at her 64-and-a-half birthday, that date, six months after her 64 birthday, that at that point in time she'll either sell the home or she'll refinance it. But he'll be paid his portion of what the court deems to be equitable.

The trial court awarded $50,000 of the home's equity to Husband and explained its rationale for the disparity between Husband and Wife:

I realize that is not half of the money that this house is worth. And I'm also going to be taking into account when I get to your alimony figure, you're not going to be paying the alimony – you may pay it for the rest of your natural life or until death or remarriage, but you're not going to be paying the big number that I otherwise would be sacking you with if she wasn't getting this house. So, in any event, that's what the Court believes to be equitable in this

case. And what's going to happen over these next, you know, approximately four and half, five, six years, . . . [is the house] can continue to grow in some value during this period of time. And at the end of this, [Wife will] be able to refinance this and pay you out, or she's going to sell it and she'll have enough money . . . [to] allow her to keep up her standard of living.

The trial court further understood that Husband was

probably not going to be happy with anything that I'm making you pay today. But I hope you realize, I've given her a little richer settlement on the house. You're not going to get as much money out of that. But I spared you paying her significantly more money for the rest of your life. And the Court's taken that into account. And that's why I'm making that change. When she turns 64 and a half, and he gets his money out of the house, and she is, by that time I'm going to be expecting her to have improved her financial position.

The trial court explained its decision to award Wife heightened equity in the house through its application of Tennessee's property division statute, Tennessee Code Annotated section 36-4-121. As it had in its oral ruling, the trial court noted all twelve statutory factors included in that statutory section and listed them for discussion in its written order, addressing the applicability or lack thereof of each to the present case. The trial court found the following: (1) concerning the duration of the parties' marriage, that Husband and Wife were married for forty years; (2) concerning the financial standing and abilities of the parties, that their respective annual earnings demonstrated that Wife's earning capacity is significantly lower than Husband's, even though both spouses are still able to work in the future; (3) concerning the contributions of each spouse generally and the specific contributions to marital property, that while Husband was "the primary bread winner" that Wife had "earned and contributed financially to the household" and also "contributed . . . in an intangible way and helped the Husband reach the level of earning he has reached"; (4) concerning the parties' financial potential, that "Husband has a greater ability for future acquisitions based upon his significantly higher income"; and (5) that Husband through a purported transfer of a Mercedes to his mother engaged in "dissipation of a significant asset" of the parties.[2] In addition to these findings, the trial court emphasized that "Wife's need for stable and affordable housing is paramount in this case. The Wife does not have a lot of income and needs a bigger home as she has the grandchildren living with her. The Husband does not need a large home as he lives by himself and travels significantly, so he only needs a 1 bedroom and potentially an office. Further, the Court finds that the Husband, based upon his significantly higher income would be able to acquire a bigger house much easier than the Wife."

_____

[2] The trial court also made a negative credibility finding against Husband on this point, writing, "the Court does not find the Husband's testimony to be credible with regard to the transfer of this vehicle to his Mother."

Based on these findings, the trial court awarded Wife the house while reserving $50,000 in household equity for Husband. To preserve Husband's financial interest, the trial court placed a lien in that amount on the house and ordered Wife to "begin making payments on the residence . . . and continue to make said payments holding the Husband harmless." Despite stating during its oral remarks that the court was going to require Wife to either sell the home or refinance the home within five years as a "stipulation," the trial court's final decree does not track this language. Instead, the trial court's decree states that Wife will either sell the marital residence and pay Husband his equity share or keep the home and pay Husband his equity share within approximately five years of the entry of the final divorce decree. This varies from the trial court's oral ruling which provided for sale or refinancing by the time Wife reached sixty-four and one-half years of age, which was approximately five years from the date of trial.

Concerning spousal support, the trial court analyzed each of the statutory factors found in Tennessee Code Annotated section 36-5-121 and awarded Wife alimony in futuro. The trial court ordered that Husband pay wife $1,500 per month for approximately five years after the entry of the final divorce decree, but that the amount would then fall to $900 per month from that point onward. In its oral ruling, the trial court indicated that it would have awarded Wife more in alimony if not for reducing Husband's equity interest in the house. The trial court expressly tied a lower spousal support award than the trial court would have otherwise awarded to the trial court's decision to award the Husband less equity in the house.

Husband's appeal challenges the trial court's decisions regarding the house. Husband takes aim at the percentage of equity that he was awarded, the five-year horizon for payment, and the failure to set a refinance or sale obligation at the end of the five-year time period in the trial court's written order. Husband also asserts that the award should be vacated because it was motivated by bias. Wife concedes that the trial court intended to order refinancing and that the trial court's order inadvertently excluded such a requirement. Wife argues that the trial court decision did not reflect bias against Husband. Additionally, Wife contends that the trial court's ruling with regard to equity in the home and five-year horizon for repayment are in accordance with Tennessee law. She asserts that neither decision constitutes an abuse of discretion by the trial court.

II.

Tennessee appellate courts "review the trial court's findings of fact after a bench trial 'de novo upon the record with a presumption of correctness, "unless the preponderance of the evidence is otherwise."'" *Mathes v. 99 Hermitage, LLC*, 696 S.W.3d 542, 552 (Tenn. 2024) (quoting *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017) (quoting Tenn. R. App. P. 13(d))). The trial court's conclusions of law, however, are reviewed de novo with no presumption of correctness. *Hughes v. Metro. Gov't of Nashville*

*& Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011); *Crockett Cnty. v. Motamedi*, No. W2023-00553-COA-R3-CV, 2024 WL 1325921, at *2 (Tenn. Ct. App. Mar. 28, 2024), *perm. app. denied* (Tenn. July 18, 2024).

## III.

Husband has indicated that his "primary complaint" on appeal is "the appearance of the court's lack of impartiality." In Husband's view, the trial court's statements about Husband and some of the positions that he took during litigation of this case, *e.g.*, that Wife should be denied ownership or access to the house, suggest that the trial court did not treat Husband fairly and impartially. Husband asserts that this perceived bias infected every decision that the trial court made, including its decision to award Husband $50,000 of equity in the house, which was only approximately a quarter of the equity in the home. While the trial court repeatedly indicated that it would perform its duties fairly and equitably, Husband called these representations "subterfuge."

"Litigants in Tennessee have a fundamental right to a fair trial before an impartial tribunal." *State v. Griffin*, 610 S.W.3d 752, 757 (Tenn. 2020) (internal quotations omitted). The public's confidence in the neutrality and impartiality of the judiciary is a significant interest, *Bean v. Bailey*, 280 S.W.3d 798, 803 (Tenn. 2009), and "[i]f the public is to maintain confidence in our system of justice, a litigant must be afforded . . . the 'cold neutrality of an impartial court.'" *State v. Cannon*, 254 S.W.3d 287, 307 (Tenn. 2008) (quoting *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 564 (Tenn. 2001)).

Under Tennessee law, "[n]ot every bias, partiality, or prejudice merits recusal." *Alley v. State*, 882 S.W.2d 810, 821 (Tenn. Crim. App. 1994). In general, "[t]o disqualify, prejudice must be of a personal character, directed at the litigant, 'must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from . . . participation in the case.'" *Id*. "[I]n-court comments that reflect a judge's unfavorable disposition towards a party based on an extrajudicial source may be grounds for disqualification if they raise reasonable questions about the judge's impartiality." *Cain-Swope v. Swope*, 523 S.W.3d 79, 89 (Tenn. Ct. App. 2016) (quoting *Groves v. Ernst-Western Corp.*, No. M2016-01529-COA-T10B-CV, 2016 WL 5181687, at *5 (Tenn. Ct. App. Sept. 16, 2016)). Alternatively, where the alleged "bias is based upon actual observance of witnesses and evidence given during the trial, the judge's prejudice does not disqualify the judge" unless "the bias is so pervasive that it is sufficient to deny the litigant a fair trial . . . ." *Alley*, 882 S.W.2d at 821. "A trial judge's remarks that are critical or hostile to the parties or their counsel ordinarily do not support a partiality challenge." *Berg v. Berg*, No. M2018-01163-COA-T10B-CV, 2018 WL 3612845, at *6 (Tenn. Ct. App. July 27, 2018). Accordingly, in making such a showing, "if a bias is alleged to stem from events occurring in the course of the litigation of a case, the party seeking a judge's recusal has a greater burden to show that recusal is required." *Id*. Additionally, "[a]ny comments made by the trial court must be construed in the context of

- 9 -

all the facts and circumstances to determine whether a reasonable person would construe those remarks as indicating partiality on the merits of the case." *State v. Boggs*, 932 S.W.2d 467, 472 (Tenn. Crim. App. 1996).

If judges "did not form judgments of the actors in those court-house dramas called trials," they "could never render decisions." *Liteky v. United States*, 510 U.S. 540, 551 (1994) (quoting *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943)). That is to say, "[f]orming an opinion of litigants and issues based on what is learned in the course of judicial proceedings is necessary to a judge's role in the judicial system." *Cain-Swope*, 523 S.W.3d at 89 (quoting *Groves*, 2016 WL 5181687, at *5). Accordingly, "an opinion formed on the basis of what a judge properly learns during judicial proceedings, and comments that reveal that opinion, are not disqualifying unless they are so extreme that they reflect an utter incapacity to be fair." *Id*. (quoting *Groves*, 2016 WL 5181687, at *5).

In the present case, Husband argues that the trial court's statements lead to the inference that the court acted with bias in making its rulings. We disagree. The language that Husband has relied upon, such as the trial court's statement that Husband's desire to take complete ownership of the house to the detriment of Wife and the grandchildren equated to Husband wanting to put Wife "out on the street like a dog," certainly reflects that the trial court had a strong negative reaction to Husband's position. *See, e.g., Strouth v. State*, 755 S.W.2d 819, 823 (Tenn. Crim. App. 1986) (noting that statements taken out of context and placed in a brief without explanation did not evidence bias, as they were more akin to "expressions of exasperation rather than prejudice" and many were taken out of context and had reasonable subsequent explanations from the judge). The record does not indicate, however, and Husband does not assert, that the trial court developed a negative opinion based upon extrajudicial evidence. While there are reasons for judges to be temperate with the language that they utilize, negative reactions by a trial court judge are sometimes to be expected based on the positions that a party takes during a case. *See Cain-Swope*, 523 S.W.3d at 89.

Also as noted above, the trial court's statements to which Husband objects have to be considered in the context in which they were made, not in a vacuum. *See Alley*, 882 S.W.2d at 822. The trial court stated, for example, that it would treat Husband fairly in spite of what it viewed to be Husband's attempts to treat Wife unfairly. These comments do not suggest that the trial court took an absolutist position against Husband or developed an opinion of Husband long before he had the chance to testify. *See id.* (collecting examples of cases where recusal was warranted on those bases). While the trial court's colorful language may have been less temperate than ideal, we are simply unpersuaded that the trial court's language is indicative that its ruling was a product of bias or that it would be perceived as such by a reasonable observer. The trial court's decision instead reflects the well-considered judgment of a neutral decision-maker who reached a decision after hearing testimony and argument and ultimately concluded that Husband's position was not just wrong, but considerably off the mark. The trial court's extraneous comments do not

- 10 -

warrant reversal.

IV.

Husband also challenges on appeal the trial court's allocation of the equity in the house on the merits, arguing that Wife should not have received three-fourths of the equity in the house. Husband contends that "none" of the trial court's findings "preponderate in favor of such a disproportionate division of the parties' biggest asset." Wife disagrees. She argues that the trial court's property division generally, as well as the home equity division specifically, were directly tied to its decision to reduce Husband's spousal support obligation and that it would be inappropriate to modify the former in isolation.

Trial courts divide a couple's marital estate using a four-step process: identification, classification, valuation, and distribution. *Trezevant v. Trezevant*, 568 S.W.3d 595, 606 (Tenn. 2018). This appeal does not concern the first three steps, as both parties agree that the trial court properly identified the house as an asset, properly classified it as a marital asset, and correctly credited the appraisers' valuation of the property at $440,000. *See id.* Instead, this appeal concerns the last step of distributing the parties' assets equitably under the circumstances. *See id.* In fulfilling this last step, Tennessee law requires trial courts to "[e]quitably divide, distribute, or assign the marital property between the parties without regard to marital fault in proportions as the court deems just based on the factors set forth in subsection (c)." Tenn. Code Ann. § 36-4-121(a)(1)(A).[3]

---

[3] The statutory text provides as follows:

(c) In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and

"The equitable division of marital property is a fact-intensive inquiry involving the careful weighing of the relevant statutory factors." *Id.* at 607 (quoting *Brainerd v. Brainerd*, No. M2015-00362-COA-R3-CV, 2016 WL 6996365, at *5 (Tenn. Ct. App. Nov. 30, 2016)). In undertaking this charge, "[t]rial courts have wide latitude in fashioning an equitable division of marital property." *Luplow v. Luplow*, 450 S.W.3d 105, 110 (Tenn. Ct. App. 2014) (citing *Fisher v. Fisher*, 648 S.W.2d 244, 246 (Tenn. 1983)). "[A]ppellate courts must accord great weight to a trial court's division of marital property. Accordingly, it is not our role to tweak the manner in which a trial court has divided the marital property." *Long v. Long*, 642 S.W.3d 803, 828 (Tenn. Ct. App. 2021) (citation omitted) (quoting *Owens v. Owens*, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007)). "Appellate courts generally defer to the trial court's decision unless it is inconsistent with the factors in Tennessee Code Annotated section 36-4-121(c) or the evidence preponderates against the trial court's ruling." *Jolly v. Jolly*, 130 S.W.3d 783, 785-86 (Tenn. 2004).

Here, Husband largely and appropriately concedes in his brief that the trial court followed the statutorily prescribed process. Specifically, Husband observes in his brief:

which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) In determining the value of an interest in a closely held business or similar asset, all relevant evidence, including valuation methods typically used with regard to such assets without regard to whether the sale of the asset is reasonably foreseeable. Depending on the characteristics of the asset, such considerations could include, but would not be limited to, a lack of marketability discount, a discount for lack of control, and a control premium, if any should be relevant and supported by the evidence;

(11) The amount of social security benefits available to each spouse;

(12) Such other factors as are necessary to consider the equities between the parties; and

(13) The total amount of attorney fees and expenses paid by each party in connection with the proceedings; whether the attorney fees and expenses were paid from marital property, separate property, or funds borrowed by a party; and the reasonableness, under the factors set forth in Rule 1.5 of the Tennessee Rules of Professional Conduct, and necessity of the attorney fees and expenses paid by each party.

Tenn. Code Ann. § 36-4-121(c).

(1) that the trial court correctly stated that not every equitable division of marital assets must be an equal division; (2) that the trial court listed and examined each of the property division factors found in Tennessee Code Annotated section 36-4-121, and made corresponding findings regarding the same; (3) that the trial court "contemplated a 50/50 division of the equity of the marital residence"; and, (4) that the trial court articulated reasons why it departed from such a 50/50 division of assets, including, among others, its "paramount" concern for Wife's need for stable and affordable housing and the conscious trade-off that the trial court made between granting Husband more equity versus requiring Husband to pay less in alimony.

In asserting that the trial court erred, Husband instead focuses his critique on two points. One, he asserts that the trial court improperly considered the minor grandchildren being in the physical custody of Wife in the Clarksville home in making a determination with regard to distribution of the marital estate. Two, Husband argues that only receiving one quarter of the equity in the home was simply too great a divergence from an even split to be an equitable division.

Regarding the trial court's consideration of the grandchildren being in the physical custody of Wife, we find no error. The General Assembly has directed trial courts in dividing marital estates to consider "[s]uch other factors as are necessary to consider the equities between the parties." Tenn. Code Ann. § 36-4-121(c)(12).[4] In the present case, Husband and Wife have three grandchildren who have been being cared for in this home for a number of years, the grandchildren are going to be continued to be cared for by Wife due to considerations related to their safety in connection with daughter's living circumstances, and Wife's interest in the home helps to facilitate this care for the grandchildren. The record also suggests that the home was bought in connection with serving this purpose. Under the circumstances of the present case, given the latitude afforded to the trial court under Tennessee Code Annotated section 36-4-121(c)(12), we cannot find fault in the trial court considering the role of the house in Wife's care of the grandchildren.

With regard to Husband's contention that the award is simply too disproportionate to be equitable, we do not agree. As Wife points out, the trial court's decision to lessen the spousal support award that she received was made in direct contemplation of Husband receiving less equity in the marital residence. The trial court engaged in an equitable trade-off, based on its understanding that Wife, if given enough time, would eventually be in a situation where she is self-sufficient and that alimony could be lowered even more at that time, but also based on its recognition that Wife, who cares for three of the parties'

_____

[4] While the trial court did not identify Tennessee Code Annotated section 36-4-121(c)(12) as a statutory basis for considering the grandchildren living with Wife in dividing the marital estate, under the circumstances of the present case, Wife's status as a caretaker of the grandchildren falls neatly within the broad final statutory factor, which allows for property distribution decisions to be made based on "such other factors as are necessary to consider the equities between the parties."

- 13 -

grandchildren, needs access to the home to take care of those children. Having heard the evidence, the trial court made plain that it would have awarded a higher alimony award if the equity in the home had not been divided so favorably for wife.

In his argument on appeal, Husband attempts to disaggregate what the trial court tied together. Essentially, Husband takes the position that what the trial court characterized as a reduced alimony award is fine but that the accompanying decreased equity award in the home to Husband is error. Though Husband suggests that the alimony award was high, the trial court plainly indicated that the alimony award was less than it would have otherwise awarded to Wife. Husband does not provide legal authority to support his assumed predicate that the trial court could not have awarded more in alimony. Furthermore, Husband has no legal authority for his argument that the trial court cannot engage in the type of equitable tradeoff that it did in the present case. It is not the role of the court to develop such arguments for Husband. *Sneed v. Bd. of Prof'l Responsibility*, 301 S.W.3d 603, 615 (Tenn. 2010) (noting that "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her"). Accordingly, we decline to sail into these waters in the present case.

At the center of Husband's argument on appeal is that awarding him approximately a quarter of the equity in the home is simply too disproportionate to be an equitable division. As an initial matter, again, Husband is viewing the home in isolation. Focusing on one asset, admittedly the most valuable, the Husband emphasizes that he only received approximately 23% in the marital home with Wife receiving 77%. This court, however, has noted that "when a party to a divorce appeals the trial court's decision concerning a division of marital property and 'wishes to focus on whether the division as to particular assets was equitable rather than whether the overall property distribution was equitable,' this Court will 'decline to do so as the goal is an overall equitable marital property distribution.'" *Brown v. Brown*, 577 S.W.3d 206, 217 (Tenn. Ct. App. 2018) (quoting *Morton v. Morton*, 182 S.W.3d 821, 834 (Tenn. Ct. App. 2005)). Accordingly, in considering Husband's equitable distribution argument, we consider it not with a distorted focus on a single asset but instead in terms of the entirety of the marital estate. Overall, Husband received approximately 40% of the distribution while Wife received approximately 60% of the estate. The trial court also tied this distribution variance to reducing the alimony award for Wife, which is a linkage that Husband has not challenged on appeal with supporting legal authority.

"An equitable division of marital property is not necessarily an equal division, and § 36-4-121(a)(1) only requires an *equitable* division." *Long*, 642 S.W.3d at 818 (quoting *McHugh v. McHugh*, No. E2009-01391-COA-R3-CV, 2010 WL 1526140, at *3 (Tenn. Ct. App. Apr. 16, 2010) (internal citations omitted)); *see also, e.g.*, *Brown*, 577 S.W.3d at 212. "The division of the estate is not rendered inequitable simply because it is not mathematically equal ...." *Telfer v. Telfer*, 558 S.W.3d 643, 654 (Tenn. Ct. App. 2018) (quoting *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998)); *see also Luplow*, 450

- 14 -

S.W.3d at 109-10 ("A division of marital property in an equitable manner does not require that the property be divided equally."). "This court has repeatedly upheld non-equal, but equitable, distributions of marital property." *Barnes v. Barnes*, No. M2022-00328-COA-R3-CV, 2023 WL 6846504, at *12 (Tenn. Ct. App. Oct. 17, 2023), *perm. app. denied* (Tenn. Mar. 6, 2024). In accordance with the overall division of the marital estate in the present case, this court has upheld an approximately 60/40 division as equitable. *Prichard v. Prichard*, No. W2022-00728-COA-R3-CV, 2023 WL 2726776, at *8-12 (Tenn. Ct. App. Mar. 31, 2023) (upholding a modified award of 40.2% to husband and 59.8% to wife).

Here, the trial court in its oral ruling noted that the marital estate was smaller than it might have otherwise been given the parties' income level as a result of the party's standard of living. The trial court noted in both its oral ruling and written order the long duration of the marriage, Husband's significantly higher income and related greater ability for future acquisitions, and Wife's need for the home in relation to caring for their three grandchildren as to whom she has physical custody. Whether the members of this court would have divided the marital estate in the same manner as the trial court is not the question, as the trial court enjoys broad discretion in dividing a marital estate. We cannot conclude under the circumstances of this case that this division exceeded the scope of the trial court's discretion.

V.

Husband also raises concern that trial court's final order failed to include an obligation upon Wife to refinance the house in five years. While the trial court made clear in its oral ruling that refinancing would be a "stipulation" placed upon Wife's primary ownership of the house, that language did not appear in the trial court's final order. At oral argument, Husband called this an oversight. In response to questioning from this court, Wife conceded that the trial court intended for Husband's debt obligation on the house to be eliminated at the five-year mark with Wife selling or refinancing but inadvertently failed to memorialize that language in its order.[5]

Based on our review of the record, we agree that the exclusion of such a requirement appears to have been merely inadvertent on the trial court's part. In its oral ruling, the trial court stated:

The Court's going to award [Wife] the marital residence with some stipulations to that. . . . She's going to be able to keep that until she reaches

---

[5] Judge's Question: With regard to the five-year time period for refinancing, would you agree that there is an oversight with regard to failure to address refinancing in the order?

Wife's Counsel: Yes. It is an oversight. . . . We agree that it is supposed to be either refinanced or sold at that five-year mark and his fifty thousand dollars equity to be paid to him.

the age of 64 and a half. So six months after her 64th birthday. At that time she's either going to refinance the house, or she's going to sell the house, and she's going to pay him. . . . [T]he Court thinks that it would be appropriate at her 64-and-a-half birthday, that date, six months after her 64th birthday, that at that point in time she'll either sell the home or she'll refinance it. But he'll be paid his portion of what the court deems to be equitable.

Based upon the trial court's ruling and the parties' representations to this court on appeal, it appears that this was, as both parties agree, simply an oversight by the trial court in failing to include the obligation in the final written order. Based on the consensus between the parties and support for their understanding in the record, we conclude that remand is warranted for the trial court to enter a revised order addressing this oversight.

VI.

Assuming the five-year horizon addressed in previous section is intended to be part of the order and was simply omitted as an oversight, Husband asserts that this amount of time is, nevertheless, an unreasonable and excessive time period for Wife to be allowed to wait before Husband is removed from the debt obligation by sale or refinancing of the house. Husband asks this court to set a reasonable time but does not identify what amount of time is reasonable.

This court has observed that

In divorce proceedings, courts cannot disturb the rights of the parties' creditors to collect joint obligations from either or both of the divorcing parties. . . .

It is not uncommon in divorce cases to turn over the ownership of a marital asset to one party while the parties remain jointly liable for the debt associated with the asset. While it is possible to order one party to make the monthly payments on a joint debt, the court cannot absolve the other party from his or her liability to the creditor. It is also unlikely that a creditor will readily agree to release a solvent debtor simply because of a divorce. Thus, if the party who has been ordered to make the monthly payments on a joint debt defaults, the other party becomes responsible for the debt and the late charges and runs the risk of damage to his or her credit rating.

Courts and lawyers have devised several ways to address this problem. The court may order, or the parties may agree, that the person awarded the property will refinance it or obtain a new loan in his or her own name and then use the proceeds to pay off the existing joint debt. The court may also order, or the parties may agree, that the property will be owned

- 16 -

jointly until a date certain when the property must either be financed or sold. Finally, the parties or the courts may include a "hold harmless" provision in the decree or marital dissolution agreement in which the parties are required to indemnify and hold each other harmless from any and all future obligations stemming from ownership of the property they receive.

*Brown*, 577 S.W.3d at 215-16 (Tenn. Ct. App. 2018) (quoting *Long v. McAllister-Long*, 221 S.W.3d 1, 10 (Tenn. Ct. App. 2006)).

Husband cites this court's decisions in *Dobbs v. Dobbs*, No. M2011-01523-COA-R3-CV, 2012 WL 3201938 (Tenn. Ct. App. Aug. 7, 2012) and *Mobley v. Caffa-Mobley*, No. M2011-02269-COA-R3CV, 2012 WL 5986544 (Tenn. Ct. App. Nov. 30, 2012), in support of his contention that the five-year time period was unreasonable. Neither of these decisions, however, established a precise timeline for refinancing or selling to remove the other spouse from the debt obligation. Both do clearly raise a concern where the trial court leaves the spouse who is not in possession of the asset with a continuing debt obligation without any end to the obligation. *Dobbs*, 2012 WL 3201938, at *4 ("We are concerned that failing to make any provision for Husband's release from the debt encumbering the marital residence may be contrary to § 36-4-121(c)(4)."); *Mobley*, 2012 WL 5986544, at *7 ("As was the case in *Dobbs*, pursuant to the Final Decree here, Husband remains indefinitely obligated to pay the outstanding debt and costs of collection if Wife defaults; further, the indefinite indebtedness impairs his ability to qualify for financing should he require a mortgage to obtain financing for housing or other needs in the future" (footnote omitted)). As a result, in *Dobbs* this court remanded "the case for the court to determine a reasonable time for Wife to secure Husband's release from indebtedness and to amend the final decree accordingly." *Dobbs*, 2012 WL 3201938, at *4. Correspondingly, the *Mobley* Court indicated "a reasonable time frame should be established by which Wife is required to satisfy the indebtedness on the . . . property for which Husband is jointly and severally liable, either by selling the property and paying the entire indebtedness or by refinancing in a manner by which Husband shall be fully released from any liability on the indebtedness." *Mobley*, 2012 WL 5986544, at *7.

In considering issues in this same vein, this court, however, has noted that "[d]ecisions regarding the division of marital property are fact-specific and require consideration of many circumstances surrounding the property and the parties." *Henegar v. Henegar*, No. M2015-01780-COA-R3-CV, 2016 WL 3675145, at *8 (Tenn. Ct. App. June 29, 2016). Accordingly, the resolution of this issue in cases has varied with the circumstances of the case. In *Henegar*, for example, this court upheld an indefinite arrangement with the debt obligation, stating

In the absence of any other feasible alternatives, the trial court in this case opted for the third option, ordering Husband to "indemnify and hold Wife harmless from any debt associated with the marital residence." We recognize

that neither Wife nor Husband is placed in an advantageous situation. However, as the trial judge aptly stated, "a divorce doesn't mean a fresh start." We cannot say that the trial court erred in its conclusion that Wife must remain a co-borrower on the mortgage due to the parties' financial constraints.

*Id.* at *8. Similarly, in *Brown*, this court preserved a more unsettled end date for ending the debt obligation:

In accordance with this Court's opinion in *Henegar* and based on the trial court's allocation of the debt encumbering the marital residence to Wife, we conclude that this is a proper case in which to modify the trial court's Final Decree to add a provision stating that Wife will indemnify and hold Husband harmless from his obligation concerning the mortgage on the marital residence until such time as the debt is paid in full or Wife is able to refinance such debt in her sole name. *See Henegar*, 2016 WL 3675145, at *8. We determine such a provision to be necessary and equitable in this matter, as well as implicit in the trial court's distribution of marital property and debt.

*Brown*, 577 S.W.3d at 217.

In the present case, the trial court adhered to the approach this court has noted as an appropriate tool in addressing such debt obligations by including a hold harmless provision. *Brown*, 577 S.W.3d at 215-17; *Long*, 221 S.W.3d at 10. The trial court also ordered Wife to begin making payments on the house as of January 5, 2024, and to continue to make payments. The trial court also placed a lien on the house in the amount of Husband's equity interest of fifty thousand dollars. The parties also agree that the trial court, as stated in its oral ruling, intended to establish a date certain for eliminating Husband's continuing debt obligation on the house to end through its sale or refinancing and simply inadvertently failed to include this in the final written order.

Insofar as Husband's argument on this issue rests upon *Dobbs* and *Mobley*, they cannot bear the weight he places upon them. The authority cited supports the proposition that the trial court should establish a reasonable time period for termination of the debt obligation through refinancing or sale, but neither case provides any direction or guidance as to how to determine what constitutes a reasonable time period. Husband argues that five years is not reasonable, but Husband did not develop before the trial court an adequate record to allow consideration of the particular circumstances of this case with regard to establishing why five years is unreasonable in the present case. Additionally, Husband has not offered legal authority supporting the proposition that five years is unreasonable; instead Husband has relied on authority supporting a reasonable time being established but not defining what constitutes a reasonable time. It is not for this court to develop this argument for Husband. *Sneed*, 301 S.W.3d at 615.

- 18 -

## VII.

Wife seeks attorney's fees related to this appeal; Husband preemptively asserted in his appellant's brief that both sides should pay their own attorney's fees for this appeal. We agree with Husband.

As an initial matter, it is not clear that Wife has adequately raised the issue of attorney's fees. The Tennessee Supreme Court has indicated that different standards may apply to appellants and appellees regarding waiver of attorney's fees on appeal. *Charles v. McQueen*, 693 S.W.3d 262, 283-84 (Tenn. 2024). The Tennessee Supreme Court recently ruled that "[w]hen a request for appellate attorney's fees does not seek relief from the judgment below, an appellee is not required to include the request in the statement of issues. But an appellee is required to present the request to the appellate court by raising it in the body of the brief, adequately developing the argument, and specifying that relief in the brief's conclusion." *Id*. at 284 (citations omitted). In present case, the first reference to attorney's fees is in Wife's (appellee's) brief appears in the conclusion and her argument for attorney's fees on appeal, while not conclusory, is thinly developed.

Assuming for purposes of argument that Wife's discussion was, nevertheless, sufficient to raise the issue of attorney's fees on appeal by an appellee, Wife's argument remains unavailing. The authority cited by Wife rests ultimately upon a statutory foundation for an award of attorney's fees under Tennessee Code Annotated section 36-5-103(c), which provides

> (c) A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the nonprevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

None of the triggering events for attorney's fees mentioned in Tennessee Code Annotated section 36-5-103(c) apply to the present case. There is no criminal or civil attempt action. *See* Tenn. Code Ann. § 36-5-103(c). This is also not an "other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order," or a "suit or action concerning the adjudication of the custody or change of custody of any children . . . ." *See id*. This appeal challenges the distribution of the marital estate exclusively. Accordingly, the ultimate statutory basis for the authority pursuant to which Wife seeks attorney's fees on appeal is simply inapplicable to the present case.

## VIII.

For the aforementioned reasons, we remand to the trial court to enter a revised order in accordance with the parties' concessions that Wife must refinance or sell the house by the age of sixty-four and one-half years in order to eliminate Husband's continuing debt obligation on the house. Regarding the other stated bases of appeal raised by Husband, we affirm the judgment of the Chancery Court for Montgomery County. Costs of this appeal are taxed to the appellant, Jeffery W. Henry, for which execution may issue if necessary. The case is remanded for further proceedings consistent with this opinion.

_s/ Jeffrey Usman_
JEFFREY USMAN, JUDGE